JUSTICE PATTERSON delivered the opinion of the Court.
**406 A member of the Police and Firemen's Retirement System (PFRS) who is found to be "mentally or physically incapacitated" from performing his or her usual duty or other available duty may retire with accidental disability benefits, provided that he or she meets the requirements prescribed by N.J.S.A. 43:16A-7(1). The statute mandates a medical board certification "that the [PFRS] member is permanently and totally disabled as a direct result of a **407 traumatic event occurring during and as a result of the performance *251 of his regular or assigned duties." Ibid. When it enacted N.J.S.A. 43:16A-7(1), the Legislature declined to define a "traumatic event" that warrants an award of accidental disability benefits. Ibid. It left that determination to the courts.
In Richardson v. Board of Trustees, PFRS, 192 N.J. 189, 212-13, 927 A.2d 543 (2007), we established a governing standard for retirement system members' accidental disability benefit applications under N.J.S.A. 43:16A-7. Under the Richardson test, the member must prove, among other requirements, that the traumatic event that he or she experienced was "undesigned and unexpected." Ibid.
For cases in which the member claims that he or she suffers from a permanent mental incapacity as a result of an exclusively psychological trauma, we amended our analysis. Under the standard established in Patterson v. Board of Trustees, SPRS, 194 N.J. 29, 34, 942 A.2d 782 (2008), the member must demonstrate that his or her disability results "from direct personal experience of a terrifying or horror-inducing event that involves actual or threatened death or serious injury, or a similarly serious threat to the physical integrity of the member or another person," and that the event is "not inconsequential but is objectively capable of causing a reasonable person in similar circumstances to suffer a disabling mental injury." If the member meets Patterson's threshold requirement, the court then applies the Richardson test; if he or she fails to do so, the court denies accidental disability benefits without applying the Richardson test. Ibid.; see also Russo v. Bd. of Trs., PFRS, 206 N.J. 14, 32, 17 A.3d 801 (2011) (explaining that once Patterson's horror-inducing event standard is satisfied, " Richardson comes into play").
In these appeals, the Court reviews two determinations of the PFRS Board of Trustees (Board), each involving a police officer's claim that he was "mentally ... incapacitated" by a traumatic event within the meaning of N.J.S.A. 43:16A-7(1). In Mount v. Board of Trustees, PFRS, the Board and the Appellate Division **408 panel rejected Officer Christopher Mount's claim that he was permanently disabled because he witnessed at close range the incineration of three young victims in an explosion after a high-speed motor vehicle collision. We hold that Mount has proven that he experienced a terrifying or horror-inducing event that meets the standard of Patterson, and that the event was undesigned and unexpected within the meaning of Richardson. We therefore reverse the Appellate Division panel's judgment and remand to the panel to decide Mount's claim that his mental disability was a direct result of that incident.
In Martinez v. Board of Trustees, PFRS, we review the Appellate Division's decision reversing the Board's denial of accidental disability benefits to Detective Gerardo Martinez, a municipal police department's hostage negotiator. Martinez claimed that his permanent disability resulted from psychological injuries sustained when a lengthy hostage negotiation ended with the shooting death of the hostage-taker, as he and Martinez spoke by cellphone. We hold that Martinez has not demonstrated that the incident that caused his disability was undesigned and unexpected under the Richardson test, and therefore conclude that he is not entitled to accidental disability benefits pursuant to N.J.S.A. 43:16A-7.
I.
A.
1.
Mount served as a Freehold Township police officer from 1996 until his retirement *252 on May 1, 2010.[1] Prior to joining the Freehold Township Police Department, Mount was trained at the Monmouth County Police Academy and served for three years as a Monmouth County Sheriff's Officer, working in courthouse security and serving warrants. **409 Although the New Jersey Civil Service Commission's job specifications for "police officer" state that an officer "[r]emoves (or assists in removing) dead or injured from wrecked and/or overturned vehicles by manually lifting them," Mount denied that he was trained to extract accident victims from vehicles. According to Mount, he was instructed to respond to a motor vehicle accident by directing traffic, conducting crowd control, and preparing accident reports. He stated that prior to the incident that gave rise to this appeal, he responded to one fatal motor vehicle accident, to other accidents resulting in serious injuries, and to emergency calls involving engine fires.
At approximately 2:00 p.m. on January 10, 2007, as Mount drove his patrol vehicle on his regular shift, he received a call from dispatch about a serious motor vehicle accident. Mount immediately responded to the location of the accident. Following police department protocol, he blocked traffic with his patrol vehicle and ran to a sport utility vehicle that had crossed the median and was facing north in a southbound lane. It was later determined that three teenagers were in that vehicle.
Mount recalled that the vehicle was extensively damaged, with black smoke emerging from the windows, and what "appeared to be the arm of a human being" hanging from the driver's side window. He heard no sound from the vehicle's interior. He recalled that a group of bystanders were screaming at him, "[d]o something-do something," and that it was "getting pretty chaotic" at the scene.
Mount stated that when he was between a foot and a foot and a half from the vehicle, it "immediately engulfed, exploded into flames right in front of [him], right inside," and that flames were "billowing out of the windows of the car." He testified that although the explosion did not knock him to the ground, it pushed him backward. Mount said that the heat from the explosion was so intense that he "felt like [his] eyelashes were going to burn off." On cross-examination, Mount conceded that the explosion burned **410 only his "[n]ose hairs, that's about it," and that he sustained no physical injuries which would have required medical treatment.
Mount testified that he lacked any firefighting equipment to combat the explosion and fire. He stated that he had only a crowbar, a small fire extinguisher intended to be used to put out "paper fires," and a basic medical kit, and that his polyester uniform would "melt" in extreme heat.
Mount called for more police patrols, emergency medical technicians, and the municipal fire department, which had already been contacted. When the fire department arrived, Mount sat in his patrol car as firefighters extinguished the fire.
When "the smoke and the dust settled," Mount returned to the vehicle, and was able to view its interior. From a distance of four to five feet, Mount saw "three human bodies that were involved in that fire." Characterizing the scene as "the worst I saw," Mount recalled that the victims' "skin was melted, the clothing was melted on to the skin." He stated that *253 "[e]verything was just like a wax," and that the victims "were molded into their car, into the vehicle. That's how they melted." Mount testified that "the smell of ... burnt flesh got into [his] nose, it got into [his] throat .... Every swallow that [he] took had that smell and that taste from the burning flesh."
Mount did not touch the victims' remains. He did not recall whether he witnessed the removal of the victims from the vehicle. He later learned that in addition to the three teenage victims whom he had observed, the driver of the other car was also killed in the accident, and a child in that car was seriously injured.
Mount contends that he began to experience psychological problems after the January 10, 2007 accident. According to Mount, "something hit him," but he "didn't know what it was." Nonetheless, he continued to work as a Freehold Township police officer for more than two years after the accident, and was not treated for any psychiatric condition until 2009, when he successfully underwent rehabilitation for alcohol abuse. Mount testified that he **411 returned to work following rehabilitation, and that he was "working fine" but "[s]till was having problems" which he could not identify.
In 2010, Mount was diagnosed with post-traumatic stress disorder (PTSD). See American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 271 (5th ed. 2013) (identifying diagnostic criteria for PTSD). As Mount explained the timing of his diagnosis, "[t]he PTSD wasn't observed or didn't come out until 2010." Following that diagnosis, he left his employment as a police officer.
2.
On August 31, 2010, Mount applied for accidental disability benefits. He identified the January 10, 2007 incident as the disabling event, and stated that he was mentally incapacitated to serve as a police officer due to PTSD and anxiety.
The Board determined that Mount was eligible for ordinary disability benefits, but denied his application for accidental disability benefits. The Board agreed that Mount satisfied several of N.J.S.A. 43:16A-7's requirements.[2] It found, however, that the January 10, 2007 incident was not "objectively capable of causing a reasonable person in similar circumstances to suffer a disabling mental injury" under Patterson, 194 N.J. at 51, 942 A.2d 782, and that the incident was not "undesigned and unexpected" as Richardson requires, 192 N.J. at 212, 927 A.2d 543. Although the Board **412 reconsidered its decision at Mount's request, it reaffirmed its denial of accidental disability benefits.
Mount appealed, and the matter was submitted as a contested case to an ALJ, who conducted a hearing. As the hearing began, the ALJ noted that based on the agreement of counsel he would address only two issues: whether the January 10, 2007 accident was undesigned and unexpected under Richardson, and whether that accident was terrifying or horror-inducing in accordance with Patterson. He acknowledged the parties' agreement that *254 no medical testimony would be presented. Mount was the sole witness at the hearing.
In his decision, the ALJ rejected the Board's determination that Mount had failed to prove that he experienced a "terrifying or horror-inducing event" under the Patterson test. He noted that Mount's "experience involved witnessing a scene in which three teenagers burned to death, smelling burning flesh, hearing concerned bystanders screaming for him to 'do something,' and having inadequate equipment to assist the victims."
The ALJ, however, ruled that Mount had failed to prove that his disability was "solely and directly related to his experience with the incident in question," in light of his continued work as a police officer immediately following the incident and for two years thereafter. He also found that the motor vehicle accident was not undesigned and unexpected for purposes of Richardson. The ALJ therefore concluded that Mount was ineligible for accidental disability benefits under N.J.S.A. 43:16A-7.
In his exceptions to the ALJ's decision, Mount contended that before the case was presented to the ALJ, the Board had conceded that Mount's disability was a direct result of the January 10, 2007 accident, and that the ALJ had improperly ruled against him on the causation issue. Counsel for the Board acknowledged that there was a procedural issue, and stated that "[s]hould the Board find that the issue of direct result was properly before the ALJ, it should provide Mount with an additional opportunity to present medical evidence to support his claim."
**413 The Board, however, adopted the ALJ's findings of fact and conclusions of law as a final agency decision, and did not specifically comment on the question of whether Mount had been afforded an opportunity to present evidence on the issue of causation.
Mount appealed the final agency decision to the Appellate Division. The Appellate Division panel did not address the ALJ's finding, adopted by the Board, that Mount's disability was not a direct result of the "terrifying or horror-inducing event," as Patterson requires. It concurred with the ALJ and the Board that because the "concededly horrific event" was within Mount's job description and contemplated by his training, the event was neither undesigned nor unexpected under Richardson. It affirmed the Board's decision.
We granted certification. 228 N.J. 56, 154 A.3d 687 (2016).
B.
1.
Martinez joined the Hammonton Police Department in 1990. In his fourth year of service, he was promoted to the rank of detective. In 2001, Martinez underwent forty hours of training on hostage negotiation conducted by the Federal Bureau of Investigation (FBI). He was designated as a hostage negotiator for the Hammonton Special Weapons and Tactics (SWAT) team, and was eventually appointed to serve as a negotiator for the Atlantic County SWAT team. Following his FBI hostage negotiation course, Martinez took additional training courses on hostage negotiation at least twice a year.
As both parties' experts on hostage negotiation explained to the ALJ, negotiators are trained to understand that the tactical component of a SWAT team may elect to enter a building without warning to confront a hostage-taker, and that such a confrontation may end with the use of force. Martinez's expert testified that a tactical team may conduct such an entry without notifying the officer assigned to negotiate with a hostage-taker in order to avoid *255 **414 the risk that a negotiator might inadvertently alert the hostage-taker about an imminent tactical operation. In his testimony, Martinez conceded that in his FBI course and periodic training, he confronted training scenarios in which a hostage standoff could not be peacefully resolved. Martinez knew, in short, that despite all best efforts, hostage negotiations sometimes fail, and that an incident may end with the use of lethal force.
Although he was designated and trained as a hostage negotiator for almost a decade, Martinez was never involved in an actual hostage situation prior to the incident that gave rise to this appeal.
On April 25, 2010, Martinez was on his way to meet his son for batting practice when he noticed police activity in a residential area in Hammonton. Although he was off-duty, Martinez stopped to offer assistance. Hammonton Police Chief Frank Ingemi told Martinez that a tactical operation was underway at a nearby home. He explained that a suspect in an armed robbery committed in Deptford earlier that day-later identified as Donald Hoffman-had eluded police officers and fled to his mother's home. Armed with a handgun, Hoffman had taken his mother, his sister, and his mother's tenant hostage.
When Martinez arrived, the Atlantic County SWAT team's supervisors were in charge of the scene, and snipers from that team surrounded the residence. Chief Ingemi had spoken to Hoffman by cellphone from outside the home, but he had been unable to persuade Hoffman to release the three hostages.
Martinez was activated to duty and immediately assumed the role of hostage negotiator. He used Chief Ingemi's cellphone to speak with Hoffman from a communications van parked near the home. Although he spoke several times with Chief Ingemi, Martinez was not in direct contact with the SWAT team supervisors in charge of the scene or members of the tactical team.
Initially, Hoffman insisted to Martinez that he and his hostages were "all going to die." He demanded to speak with the President and the Governor. As he was trained to do, Martinez spoke to **415 Hoffman in a calm and reassuring manner. He addressed Hoffman by his first name, and encouraged Hoffman to call him "Gerry." In his conversations with Hoffman, Martinez broached a range of topics, including sports, hobbies, religion, food, and children.
After spending an hour speaking by cellphone with Martinez, Hoffman released the three hostages, and they escaped from the residence. For the next ten hours, Hoffman remained in his mother's home, refusing to surrender to police. First using Chief Ingemi's cellphone and later his own, Martinez had several protracted conversations with Hoffman. In those conversations, Martinez sought to build Hoffman's trust and to persuade him to peacefully resolve his standoff with the police.
At one point, Hoffman stated that he wanted to eat and sleep. He terminated his conversation with Martinez, promising to call Martinez back. Martinez attempted several times to contact Hoffman by cellphone, but Hoffman did not respond to the calls.
As hours went by with no resolution, Chief Ingemi and other officers were increasingly concerned that the standoff was ongoing with only a few hours remaining until the time when children in the neighborhood would be leaving for school. They decided to take affirmative steps to bring the situation to a close.
At approximately 3:00 a.m. on Monday, April 26, 2010, the tactical team began firing tear gas canisters into the home.
*256 The team conducted that phase of the operation for about an hour.
Martinez, still in the communications van, received a call from dispatch stating that Hoffman had called 9-1-1 demanding to speak with him. When dispatch connected Hoffman to Martinez by cellphone, Hoffman exclaimed, "Gerry, Gerry, what's going on? They're going to kill me. You know, what are you doing?" Martinez responded, "No, Don. Come out .... We're going to help you out."
At 4:17 a.m., without alerting Martinez in advance, the tactical team entered the home. Chief Ingemi testified that he chose not to inform Martinez of the tactical operation in advance because he **416 knew that Martinez would be upset about that development and would try to persuade the supervising officers to keep the tactical team out of the home.
Martinez, still speaking with Hoffman by cellphone, heard a commotion as officers moved through the house. One officer spotted Hoffman in a rear bathroom, holding his cellphone to his ear. Hoffman pointed a handgun at the officer and announced that he would shoot the officer. The officer heard Hoffman say "Gerry-Gerry, like, why." The officer heard a click as Hoffman unsuccessfully attempted to fire his gun, which was later determined to have malfunctioned. The officer fired two shots at Hoffman, killing him. Through the cellphone connection, Martinez heard Hoffman yell "Gerry, Gerry .... Help me. Help me, Gerry. They're going to kill me," followed by "two pops" and then silence.
As Martinez left the communications van and walked to the street in an effort to compose himself, he saw officers remove Hoffman's body from the house and place it on the lawn. He later saw Hoffman's body at the same location, covered in a white sheet.
Following the incident, Martinez returned to work as a Hammonton detective but "just couldn't do the job." He stated that as a result of Hoffman's death, he suffered from flashbacks, erratic sleep patterns, irritability, irregular diet, and a sense of isolation.
Martinez was diagnosed with PTSD and major depressive disorder. He was initially placed on administrative leave and collected workers' compensation benefits. Martinez briefly returned to work, then left the Hammonton Police Department; his last day of work was July 14, 2011, fourteen months after the incident. He briefly held a management job in a business, but it "didn't work out."
2.
On October 13, 2011, Martinez applied for accidental disability benefits, and requested a retirement date of March 1, 2012. He stated that he was incapacitated for further service as a police **417 officer due to his PTSD and depression, and that he was "re-experiencing" the incident that ended with Hoffman's death.
The Board found Martinez to be eligible for ordinary disability benefits but ineligible for accidental disability benefits. The Board conceded that Martinez had met some of the requirements prescribed by N.J.S.A. 43:16A-7(1).[3] It concluded, however, *257 that the April 25-26 incident was not undesigned and unexpected for purposes of Richardson. The Board found "no evidence that the event was objectively capable of causing a reasonable person in similar circumstances to suffer a disabling mental injury" under Patterson, because Martinez did not have a "direct personal experience of a terrifying or horror-inducing event that involved actual or threatened death or serious injury, or a similarly serious threat to the physical integrity of the member or another person."
Martinez appealed, and the matter was submitted as a contested case to an ALJ. At the hearing before the ALJ, Martinez, other officers, and both parties' hostage-negotiation experts testified.
Relying primarily on Martinez's PTSD diagnosis, the ALJ ruled that Martinez was entitled to accidental disability pension benefits. He found that Martinez "had a direct personal experience of a terrifying or horror-inducing event" that met the objective reasonableness standard of Patterson because he conducted protracted hostage negotiations that ended with Hoffman's death. He further concluded that the event was undesigned and unexpected under Richardson because Hoffman's shooting was "a complete surprise" to Martinez.
**418 In a final agency decision, the Board rejected the ALJ's determination in favor of Martinez. It adopted the ALJ's findings of fact with an addition: "there was nothing that occurred [during the incident] that [Martinez] should not have been prepared for as a trained negotiator." The Board found the ALJ's conclusions of law, particularly the ALJ's reliance on the PTSD diagnosis, to be erroneous, and stated that in order to be "undesigned and unexpected," an event must involve "something more than the mere performance of the regular and assigned duties."
Martinez appealed the Board's decision. An Appellate Division panel concluded that Martinez had experienced a "terrifying or horror-inducing event"-a fatal shooting-and satisfied the Patterson test. It further held that the shooting was undesigned and unexpected for purposes of Richardson. The panel reasoned that an incident may be undesigned and unexpected even if, in hindsight, the employee could have anticipated that it could occur, and that an employee's general training does not convert an unexpected event into an expected one. The panel therefore reversed the Board's determination.
We granted the Board's petition for certification. 230 N.J. 496, 169 A.3d 985 (2017).
II.
A.
We review the Board's decisions in these appeals in accordance with a deferential standard of review. "An administrative agency's final quasi-judicial decision will be sustained unless there is a clear showing that it is arbitrary, capricious, or unreasonable, or that it lacks fair support in the record." Russo, 206 N.J. at 27, 17 A.3d 801 (quoting In re Herrmann, 192 N.J. 19, 27-28, 926 A.2d 350 (2007) ); accord In re Carter, 191 N.J. 474, 482-83, 924 A.2d 525 (2007). We are not, however, " 'bound by an agency's interpretation of a statute or its determination of a strictly legal issue,' particularly when 'that interpretation is inaccurate **419 or contrary to legislative objectives.' " Russo, 206 N.J. at 27, 17 A.3d 801 (first quoting *258 Mayflower Sec. Co. v. Bureau of Sec., Div. of Consumer Affairs, 64 N.J. 85, 93, 312 A.2d 497 (1973) ; then quoting G.S. v. Dep't of Human Servs., DYFS, 157 N.J. 161, 170, 723 A.2d 612 (1999) ). Instead, we review de novo the Board's interpretation of N.J.S.A. 43:16A-7(1) and our case law. Ibid.; Ardan v. Bd. of Review, 231 N.J. 589, 604, 177 A.3d 768 (2018) ("[A]n appellate court is 'in no way bound by the agency's interpretation of a statute or its determination of a strictly legal issue.' " (quoting U.S. Bank, N.A. v. Hough, 210 N.J. 187, 200, 42 A.3d 870 (2012) ) ).
B.
"Like all of the public retirement systems, the PFRS includes provisions for the grant of ordinary and accidental disability benefits." Patterson, 194 N.J. at 42, 942 A.2d 782 (citing N.J.S.A. 43:16A-6 to -7). "[A] [PFRS] member can qualify for ordinary disability benefits if he is disabled for any reason; the disability need not have a work connection." Russo, 206 N.J. at 28, 17 A.3d 801.
To be eligible for greater benefits under the accidental disability provision, however, a PFRS member must satisfy N.J.S.A. 43:16A-7(1)'s more rigorous requirements. That provision authorizes an award of benefits provided that
the medical board, after a medical examination of such member, shall certify that the member is permanently and totally disabled as a direct result of a traumatic event occurring during and as a result of the performance of his regular or assigned duties and that such disability was not the result of the member's willful negligence and that such member is mentally or physically incapacitated for the performance of his usual duty and of any other available duty in the department which his employer is willing to assign to him.
[ N.J.S.A. 43:16A-7(1).][4]
**420 The Legislature did not define the term "traumatic event" for purposes of the PFRS statute or the analogous statutes that govern other public employee retirement systems.[5] In the absence of statutory guidance as to the meaning of the term, appellate judges have long grappled with "the elusive concept of what constitutes a 'traumatic event.' " Gable v. Bd. of Trs., PERS, 115 N.J. 212, 215, 557 A.2d 1012 (1989). As we have noted, "the question of what constitutes a 'traumatic event' ... has dogged courts for generations." Russo, 206 N.J. at 28, 17 A.3d 801.
In one of our early decisions interpreting N.J.S.A. 43:16A-7(1), we observed that a " 'traumatic event' would ordinarily involve a mishap or accident involving the application of some kind of external force to the body or the violent exposure of the body to some external force." Cattani v. Bd. of Trs., PFRS, 69 N.J. 578, 586, 355 A.2d 625 (1976). Following an amendment to the statute, we adopted a three-part test requiring that a member demonstrate:
*259 (1) that his injuries were not induced by the stress or strain of the normal work effort;
(2) that he met involuntarily with the object or matter that was the source of the harm; and
(3) that the source of the injury itself was a great rush of force or uncontrollable power.
[ Kane v. Bd. of Trs., PFRS, 100 N.J. 651, 663, 498 A.2d 1252 (1985).]
The Kane standard was criticized as impractical and producing inconsistent results; one Appellate Division panel viewed that **421 standard to provide "no uniformly workable basis" to predict the outcome in a typical case. Caminiti v. Bd. of Trs., PFRS, 394 N.J. Super. 478, 482, 927 A.2d 560 (App. Div. 2007) ; see also Richardson, 192 N.J. at 208-09, 927 A.2d 543 (noting inconsistent Appellate Division cases applying Kane standard). As we acknowledged when we decided Richardson, our jurisprudence was "in need of a course correction." 192 N.J. at 210, 927 A.2d 543.
Richardson arose from a corrections officer's claim of accidental disability benefits predicated on a physical disability resulting from the officer's altercation with an inmate. Id. at 193-94, 927 A.2d 543. Noting that N.J.S.A. 43:16A-7(1)'s express terms starkly limit the grant of accidental disability benefits, we prescribed a five-pronged standard mandating that a PFRS member seeking such benefits prove
1. that he is permanently and totally disabled;
2. as a direct result of a traumatic event that is
a. identifiable as to time and place,
b. undesigned and unexpected, and
c. caused by a circumstance external to the member (not the result of pre-existing disease that is aggravated or accelerated by the work);
3. that the traumatic event occurred during and as a result of the member's regular or assigned duties;
4. that the disability was not the result of the member's willful negligence; and
5. that the member is mentally or physically incapacitated from performing his usual or any other duty.
[ Id. at 212-13, 927 A.2d 543.]
We characterized as "[t]he polestar of the inquiry" the question "whether, during the regular performance of his job, an unexpected happening, not the result of pre-existing disease alone or in combination with the work, has occurred and directly resulted in the permanent and total disability of the member." Id. at 214, 927 A.2d 543.
In Richardson, we set forth several examples of undesigned and unexpected events: "[a] policeman can be shot while pursuing a suspect; a librarian can be hit by a falling bookshelf while re-shelving books; a social worker can catch her hand in the car door **422 while transporting a child to court." Ibid. We also contrasted an officer who has a heart attack while chasing a suspect, who has not experienced a "traumatic event" under N.J.S.A. 43:16A-7, with an officer disabled during a chase due to a fall, who has suffered such a "traumatic event." Id. at 213, 927 A.2d 543. We explained that a gym teacher who develops arthritis from repetitive effects of his work over the years is not entitled to accidental disability benefits, whereas "the same gym teacher who trips over a riser and is injured has satisfied the standard." Ibid. We anticipated that those examples would facilitate application of the statutory "traumatic event" standard in a diverse array of settings.
In the wake of Richardson, an Appellate Division panel applied the "undesigned and unexpected" standard to a firefighter's *260 claim for accidental disability benefits. See Moran v. Bd. of Trs., PFRS, 438 N.J. Super. 346, 353-55, 103 A.3d 1217 (App. Div. 2014). In Moran, the PFRS member was assigned to a fire department's engine company, and was primarily responsible for transporting fire equipment into a building and extinguishing fires, not rescuing victims. Id. at 349, 103 A.3d 1217. The member responded to a fire at what was thought to be a vacant home before the arrival of his department's truck company, which was equipped and trained for fire rescues. Id. at 350, 103 A.3d 1217. After hearing the screams of people trapped in the home, he used his "shoulder, leg and back" to break down the door and rescued the victims. Ibid. He sustained serious injuries in the process. Id. at 347, 103 A.3d 1217.
Reversing the Board's denial of accidental disability benefits, a decision that the Board had premised on Moran's conduct of "one of his expected work-related duties, rescuing fire victims," id. at 353, 103 A.3d 1217, the Appellate Division panel found the incident to be undesigned and unexpected:
The undesigned and unexpected event here was the combination of unusual circumstances that led to Moran's injury: the failure of the truck unit to arrive, and the discovery of victims trapped inside a fully engulfed burning building, at a point when Moran did not have available to him the tools that would ordinarily be used to break down the door. As a result, he was forced to carry out his paramount duty to rescue fire victims, by manually kicking in the door. Had he not responded **423 immediately to break down the door, the victims would have died. That was Moran's unrebutted, credible testimony.
[ Id. at 354, 103 A.3d 1217 (footnote omitted).]
The panel recognized the officer's job responsibilities and training to be relevant factors, and carefully analyzed those factors along with the circumstances that confronted the officer, thereby concluding that the event was undesigned and unexpected.[6] Id. at 354-55, 103 A.3d 1217.
In Patterson, we addressed a difficult issue not raised by Richardson: what standard should govern when a member premises his or her claim for accidental disability benefits on "a permanent mental disability as a result of a mental stressor, without any physical impact." Patterson, 194 N.J. at 33, 942 A.2d 782. We observed that "in the context of psychological injuries, the proofs related to the traumatic nature of an event and the causal relationship between event and injury may be more problematic than in the case of a physical event." Id. at 48, 942 A.2d 782. We acknowledged that "the [retirement system] boards have expressed legitimate concerns about becoming bogged down in litigation over idiosyncratic responses by members to inconsequential mental stressors." Id. at 48-49, 942 A.2d 782.
To address those concerns, we limited the recovery of accidental disability benefits to situations in which the member is disabled by "stressors sufficient to inflict a disabling injury when experienced by a reasonable person in similar circumstances." Id. at 50, 942 A.2d 782. As examples of retirement system members who "could vault the traumatic event threshold," we cited "a permanently mentally disabled policeman who sees his partner shot; a teacher who is held hostage by a student; and a government lawyer used as a shield by a defendant." Ibid.
*261 Our decision in Patterson thus gave rise to a threshold inquiry in a particularly challenging category of applications. We required that a member, seeking to predicate an award of accidental **424 disability benefits on a mental disability due entirely to mental stressors, prove that the disability resulted from a "direct personal experience of a terrifying or horror-inducing event that involves actual or threatened death or serious injury, or a similarly serious threat to the physical integrity of the member or another person." Id. at 34, 942 A.2d 782. We reasoned that this requirement would "achieve the important assurance that the traumatic event posited as the basis for an accidental disability pension is not inconsequential but is objectively capable of causing a reasonable person in similar circumstances to suffer a disabling mental injury." Ibid.
Applying the new standard to the claims of the three law enforcement officers who pursued the Patterson appeal, we found that a member who was mentally disabled because of a superior officer's disparaging comments fell short of that benchmark, and was not entitled to benefits. Id. at 51, 942 A.2d 782. In contrast, an officer subjected to death threats from other officers and an officer whose wife and daughter were threatened by gang members met the threshold determination prescribed by that decision. Id. at 53, 942 A.2d 782. In both of those appeals, the Court remanded for a determination whether they met the remaining requirements of N.J.S.A. 43:16A-7(1). Id. at 51-53, 942 A.2d 782.
Following our decision in Patterson, we applied its standard in two divergent settings. Russo arose from the mental disability claim of a police officer-neither trained nor equipped to confront a major fire-who was ordered into a burning house to rescue the residents. 206 N.J. at 19, 17 A.3d 801. The officer heard the cries of a victim, trapped on an upper floor, but was prevented by the intense flame and heat from reaching that victim. Ibid. The officer's distress over that victim's death was compounded by the statements of family members at the scene, who blamed him for failing to rescue the victim. Id. at 20, 17 A.3d 801. The officer was diagnosed with PTSD following that event, and was found by the expert for the Board of Trustees to be permanently and totally disabled as a result of the fire.[7] Id. at 20-21, 17 A.3d 801.
**425 We concluded in Russo that the officer met the benchmark of Patterson. Id. at 33-34, 17 A.3d 801. Although we cited Russo's lack of firefighting training and equipment as a relevant factor, our decision was also premised on the extraordinary intensity of the fire, Russo's exposure to the victim's cries for help, and the relatives' recriminations in the midst of a family tragedy. Ibid. Those factors collectively gave rise to a terrifying or horror-inducing event that was objectively capable of causing a reasonable person in similar circumstances to suffer a disabling mental injury. Id. at 34, 17 A.3d 801.
The member's claim in Thompson v. Board of Trustees, TPAF, 449 N.J. Super. 478, 481-83, 158 A.3d 1195 (App. Div. 2017), aff'd, 233 N.J. 232, 184 A.3d 455, 2018 WL 2049289 (2018), presented a stark contrast to the claim that gave rise to Russo. There, a former health and physical *262 education teacher who taught students with disabilities sought accidental disability benefits under N.J.S.A. 18A:66-39(c), a provision addressing such claims when they are asserted by members of the Teachers' Pension and Annuity Fund. Id. at 483-84, 158 A.3d 1195. The member premised her application on three incidents during physical education classes in the course of a nine-month span: an incident in which a student punched and slapped her; an incident in which a student pushed and shoved her; and an incident in which a student swore at her, briefly restrained her hands, and unsuccessfully attempted to punch her. Id. at 481-82, 158 A.3d 1195. When all three incidents occurred, multiple teachers' aides were present in the room and able to assist the teacher, and school security could readily be summoned. Ibid.
Noting the absence of evidence that the teacher's encounters with the students involved "actual or threatened death or serious **426 injury" under Patterson, the Appellate Division panel affirmed the Board's determination rejecting the teacher's application for benefits. Id. at 481, 158 A.3d 1195. We affirmed the panel's finding that the member's mental disability claim in Thompson failed the Patterson objective reasonableness test. Thompson, 233 N.J. at 232, 184 A.3d 455.
In sum, our jurisprudence construing N.J.S.A. 43:16A-7(1)'s "traumatic event" language mandates a two-step analysis in cases in which a member claims permanent mental incapacity as a result of an exclusively psychological trauma. The court first determines whether the member directly experienced a "terrifying or horror-inducing event that involves actual or threatened death or serious injury, or a similarly serious threat to the physical integrity of the member or another person." Patterson, 194 N.J. at 50, 942 A.2d 782. That event must be "of consequence and objectively capable of causing a reasonable person to suffer a disabling mental injury." Russo, 206 N.J. at 31, 17 A.3d 801. If the event meets the Patterson test, the court then applies the Richardson factors to the member's application. Id. at 32-33, 17 A.3d 801.
We apply that standard to these appeals.
C.
1.
In Mount v. Board of Trustees, PFRS, the Board adopted the ALJ's finding that the explosion and fire witnessed by Mount was a "terrifying or horror-inducing event that involves actual or threatened death or serious injury." Consequently, we need not consider the Patterson standard in this appeal. The Board also found in favor of Mount with respect to all components of the Richardson test, save two: the requirement that the event was undesigned and unexpected, and the requirement that the member prove that his or her mental disability was the direct result of the "traumatic event," as N.J.S.A. 43:16A-7(1) requires.
**427 Addressing whether Mount's accident was undesigned and unexpected under Richardson, the parties dispute the significance of Mount's job description and training. Mount contends that the Appellate Division panel improperly relied on our observation in Russo that "an employee who experiences a horrific event which falls within his job description and for which he has been trained will be unlikely to pass the 'undesigned and unexpected' test." 206 N.J. at 33, 17 A.3d 801. The Board maintains that because the incident fell squarely within Mount's job description, he cannot satisfy the "undesigned and unexpected" standard of Richardson.
*263 Our comment about training in Russo should not be construed to mean that the inquiry regarding whether an event is "undesigned and unexpected" is resolved merely by reviewing the member's job description and the scope of his or her training. In a given case, those considerations may weigh strongly for or against an award of accidental disability benefits. To properly apply the Richardson standard, however, the Board and a reviewing court must carefully consider not only the member's job responsibilities and training, but all aspects of the event itself. No single factor governs the analysis.
In this case, Mount confronted a catastrophic accident at close range. He initially viewed a victim's arm hanging from the vehicle's window. Bystanders approached the vehicle demanding that Mount rescue the occupants. With no firefighting equipment except a small fire extinguisher, Mount faced the imminent threat of an explosion. Within moments, the car burst into flames. As Mount learned minutes later, the explosion "melted" the young victims' bodies into the interior of the vehicle.
By virtue of his job description, training, and prior experience, Mount could anticipate being called to accidents that were serious or even fatal. As his job description suggests, in some circumstances Mount would be expected to remove victims from a damaged vehicle pending the arrival of medical personnel. Mount, however, was not trained to combat, unassisted, an explosion of such magnitude experienced at such a close range. With no **428 firefighting equipment or protective gear, he was helpless in the face of a terrible tragedy.
We conclude that by virtue of those extraordinary circumstances, Mount confronted an incident that was undesigned and unexpected, and therefore satisfied that component of the Richardson test. 192 N.J. at 212-13, 927 A.2d 543. Accordingly, we hold that the Board's determination that Mount did not experience a "traumatic event" for purposes of N.J.S.A. 43:16A-7(1) lacked fair support in the record, and that the Appellate Division panel should have reversed that determination. See Russo, 206 N.J. at 27, 17 A.3d 801 ; Carter, 191 N.J. at 482-83, 924 A.2d 525.
That holding, however, does not entirely resolve this appeal. In accordance with N.J.S.A. 43:16A-7(1)'s language, Patterson and Richardson impose a burden on the member to demonstrate that his or her mental disability directly resulted from the qualifying traumatic event. See N.J.S.A. 43:16A-7(1) (imposing requirement that member prove he or she "is permanently and totally disabled as a direct result of a traumatic event"); Patterson, 194 N.J. at 50, 942 A.2d 782 (requiring that member's disability "result from direct personal experience" of qualifying traumatic event); Richardson, 192 N.J. at 213, 927 A.2d 543 (mandating that member prove disability was "a direct result" of qualifying traumatic event). For reasons that the record does not entirely explain, the ALJ made a causation finding with no medical proof from either party, the Board did not address that finding, and the Appellate Division panel did not reach the question whether Mount proved that his mental disability directly resulted from the January 10, 2007 accident. The issue of causation is thus unresolved.
We remand this matter to the Appellate Division panel for its consideration of whether Mount's disability directly resulted from the January 10, 2007 incident. If the panel determines that the record is inadequate for that determination, it may remand the case so that the parties may supplement the record on that issue.
*264 **429 2.
In Martinez v. Board of Trustees, PFRS, the Appellate Division panel reversed the Board's determination that Martinez failed to satisfy the Patterson standard. The panel concluded that Martinez had proven that he directly and personally experienced a terrifying or horror-inducing event.
The Board urges that we uphold its finding that Martinez experienced Hoffman's death only remotely, not directly and personally as our decision in Patterson requires. Martinez counters that after speaking with Hoffman over a period of twelve to fourteen hours, and hearing Hoffman's cries for help as the shooting occurred, he had a direct personal experience of a terrifying or horror-inducing event. He contends that the Appellate Division properly found that he satisfied the Patterson test.
We concur with the Appellate Division panel that Martinez directly and personally experienced a terrifying or horror-inducing event under Patterson and hold that the Board's finding on that issue lacked fair support in the record. See Russo, 206 N.J. at 27, 17 A.3d 801 ; Carter, 191 N.J. at 482-83, 924 A.2d 525.
The panel properly observed that although Martinez experienced no threat to his own safety, the incident involved a threat of death or serious injury "to the physical integrity of ... another person." Patterson, 194 N.J. at 50, 942 A.2d 782. We share the panel's view that Martinez's experience of Hoffman's shooting was direct and personal, given his lengthy conversations with Hoffman prior to the shooting, Hoffman's pleas for help to Martinez as he was killed, and Martinez's view of Hoffman's body as it was transported outside. That incident meets Patterson's objective reasonableness standard. See ibid.
We disagree with the panel, however, with respect to its reversal of the Board's ruling as to the application of the Richardson factors. We find ample support in the record for the Board's determination that Hoffman's shooting was not undesigned and **430 unexpected. See Russo, 206 N.J. at 27, 17 A.3d 801 ; Carter, 191 N.J. at 482-83, 924 A.2d 525.
Martinez's expert explained why a hostage negotiator in telephone contact with a suspect may not be informed that a tactical entry is imminent. The record established that based on his training, Martinez had reason to anticipate that, without prior warning to him, a tactical entry might be made into the home of Hoffman's mother.
Moreover, the ALJ and the Board did not rely exclusively on Martinez's training. Instead, they considered evidence regarding the precise police tactics that were used in this specific case and the warning that those tactics gave Martinez that the hostage standoff might end violently.
Police officers testified about the sequence of events during the early morning of April 26, 2010 that led to Hoffman's shooting. For a full hour before Hoffman was shot, the tactical team attempted to flush him from the residence by throwing tear gas canisters through various windows. Martinez knew, from the sounds he heard over the telephone, that this phase of the tactical operation was underway. He also knew that tear gas failed to bring about Hoffman's peaceful surrender. Martinez had every reason to expect that the next step would be the tactical team's entry into the home. Based on Hoffman's behavior, it was readily apparent that if SWAT team members forced their way into the residence, a violent encounter could occur. In a time span of only a few hours, Hoffman committed an armed robbery, eluded police officers, held the *265 SWAT team at bay with a firearm, and threatened his mother, his sister, and a third individual. Hoffman initially told Martinez that the situation would end with the death of his hostages, police officers, and himself. Although Martinez's skill and ingenuity led to the hostages' release and defused the situation for many hours, Hoffman's statements and conduct portended a violent confrontation with police.
In short, the Board's conclusion that Hoffman's shooting was not undesigned and unexpected was premised on far more than a **431 formulaic review of Martinez's job description and training. It was also based on the sequence of events that led to Hoffman's death. Although the shooting was clearly devastating to Martinez-an officer exemplary for his professionalism and compassion in highly stressful circumstances-it was not "undesigned and unexpected" under Richardson.
Accordingly, we reverse the Appellate Division's determination and reinstate the Board's finding that Martinez is not entitled to accidental disability benefits under N.J.S.A. 43:16A-7(1).
III.
In our applications of N.J.S.A. 43:16A-7(1) and analogous provisions regarding accidental disability benefits, we have endeavored to discern and advance the Legislature's intent, as expressed in its statutory language. See Russo, 206 N.J. at 27, 17 A.3d 801 ; Patterson, 194 N.J. at 47, 942 A.2d 782 ; Richardson, 192 N.J. at 210-12, 927 A.2d 543 ; Kane, 100 N.J. at 662-63, 498 A.2d 1252. When we construe those statutes, we are mindful of the Legislature's intent to assist certain first responders and other retirement system members disabled under extraordinary circumstances while conserving the limited resources of the retirement funds. As Richardson reflects, we view the Legislature's mandate that a member prove that his or her disability was the direct result of a "traumatic event" to impose a significant limitation on the recovery of enhanced benefits. 192 N.J. at 210, 927 A.2d 543. Appeals such as Patterson and the two matters now before the Court, which involve mental disabilities arising exclusively from mental stressors, pose particular challenges in that regard.
The Legislature has the authority to refine the statutory language to clarify its intent regarding the term "traumatic event" as it applies in future cases. It may consider a statutory provision governing claims for accidental disability benefits based on physical injuries sustained by first responders. It may also decide to enact a provision separately addressing cases arising from mental disabilities attributed exclusively to mental stressors. Additional **432 guidance from the Legislature would assist retirement system members, boards, and counsel as they consider applications for benefits, and our courts as they review these important determinations.
IV.
In Mount, we reverse the Appellate Division panel's judgment and remand the matter to the panel for its review of the Board's determination that Mount's disability was not the "direct result" of the event that he experienced on January 10, 2007.
In Martinez, we reverse the Appellate Division panel's determination and reinstate the Board's determination.
CHIEF JUSTICE RABNER and JUSTICES LaVECCHIA, ALBIN, FERNANDEZ-VINA, SOLOMON, and TIMPONE join in JUSTICE PATTERSON's opinion.

We summarize the facts based on the record presented to the Administrative Law Judge (ALJ) in each matter.

The Board found that Mount was permanently and totally disabled from the performance of his regular and assigned duties, and that he was physically or mentally incapacitated from the performance of his usual duties or other duties that his employer was willing to offer. It concluded that the January 10, 2007 incident was identifiable as to time and place, and that it occurred during and as a result of Mount's regular and assigned duties. The Board deemed Mount's disability to be caused by a circumstance external to Mount, and determined that it was not the result of a preexisting disease, or the result of his willful negligence.

The Board concluded that Martinez was permanently and totally disabled from the performance of his regular and assigned job duties and that he was physically or mentally incapacitated from the performance of his usual duties or other duties that his employer was willing to offer. It further found that the event that caused Martinez's reported disability was identifiable as to time and place, that it was caused by a circumstance external to Martinez, that it was not the result of a preexisting disease, and that it occurred during and as a result of Martinez's regular and assigned duties. The Board also found that Martinez's disability was not the result of his willful negligence.

If a PFRS member applies for accidental disability benefits, and the Board finds that he or she "is not eligible for accidental disability since the incapacity is not a direct result of a traumatic event occurring during and as a result of the performance of the member's regular or assigned duties," the member "will be retired on an ordinary disability retirement allowance." N.J.A.C. 17:4-6.7.

The Prison Officers' Pension Fund, N.J.S.A. 43:7-12 ; the Public Employees' Retirement System, N.J.S.A. 43:15A-43 ; the State Police Retirement System, N.J.S.A. 53:5A-10(a) ; and the Teachers' Pension and Annuity Fund, N.J.S.A. 18A:66-39(c), all offer accidental disability benefits. The requirements for accidental disability benefits under those statutes are substantially similar to the requirements of N.J.S.A. 43:16A-7(1). None of the statutes includes a definition of the term "traumatic event" in its definition section. See N.J.S.A. 18A:66-2 ; N.J.S.A. 43:15A-6 ; N.J.S.A. 43:16A-1 ; N.J.S.A. 53:5A-3.

We do not consider the application of the "undesigned and unexpected" standard to first responders who have sustained physical injuries.

Although Russo was hospitalized overnight for smoke inhalation, his application for accidental disability benefits was premised exclusively on his mental disability, not a disabling physical injury. Russo, 206 N.J. at 19-20, 17 A.3d 801. Thus, Patterson governed. Id. at 18-19, 17 A.3d 801 ; cf. Caminiti v. Bd. of Trs., PFRS, 431 N.J. Super. 1, 14, 66 A.3d 192 (App. Div. 2013) ("The Patterson standard is inapplicable where [an applicant] suffers both a physical and psychiatric injury.").