**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1418-18T4

WALTER D. SEVERNS,

      Petitioner-Appellant,

v.

BOARD OF TRUSTEES,
POLICE AND FIREMEN'S
RETIREMENT SYSTEM,

      Respondent-Respondent.

_____

Submitted March 24, 2020 – Decided April 22, 2020

Before Judges Yannotti and Hoffman.

On appeal from the Board of Trustees of the Police and Firemen's Retirement System, Department of Treasury, PFRS No. 3-10-047578.

Alterman & Associates, LLC, attorneys for appellant (Stuart J. Alterman and Timothy J. Prol, on the briefs).

Gurbir S. Grewal, Attorney General, attorney for respondent (Melissa H. Raksa, Assistant Attorney General, of counsel; Austin J. Edwards, Deputy Attorney General, on the brief).

PER CURIAM

Petitioner Walter D. Severns appeals from a final decision of the Board of Trustees (Board) of the Police and Firemen's Retirement System (PFRS), which denied his application for accidental disability retirement benefits. We affirm.

I.

In October 2012, Severns submitted an application to the Board seeking accidental disability retirement benefits, claiming he was permanently and totally disabled as a direct result of a traumatic event that occurred during the performance of his regularly-assigned duties. On October 7, 2013, the Board granted Severns ordinary disability retirement benefits but found that he was not eligible for accidental disability retirement benefits. Severns filed an administrative appeal, and the Board referred the matter to the Office of Administrative Law for a hearing before an Administrative Law Judge (ALJ).

At the hearing, Severns testified that in December 2010, he was employed as a police officer for the City of Camden. He had been a patrolman on the City's police force for eleven years, and he had law-enforcement experience for a combined total of sixteen to seventeen years. Severns stated that on December 25, 2010, while on duty, he received a call from dispatch reporting there was a

man with a gun in a certain block of Yorkship Square, near an alley with two entrances.

Officers Rivera and Inostroza also responded to the call. Inostroza exited his patrol car, and Rivera told Severns the suspect had gone into the alley. Rivera said he saw the gun in the suspect's waistband. He stated that the suspect pulled the gun out and ran. Severns stayed in his patrol car as Inostroza and Rivera chased the suspect on foot.

Severns then drove down the street and the other officers went into the alley. Severns said he intended to cut off the suspect. He saw the suspect running with the weapon in his right hand. He parked his car at an angle and opened the car door to take up a defensive position. The suspect was pinned by the car for several seconds.

According to Severns, the suspect looked at him, jumped over the bumper, and ran to the side of his vehicle. Severns opened the door of his police vehicle and used it to pin the suspect up against the fence. Severns looked for Inostroza and Rivera but they had not yet arrived on the scene. Severns testified that the suspect was two to three feet away. The suspect pointed the gun at Severns. The suspect had his finger on the trigger and Severns heard two clicks.

A-1418-18T4

Severns moved to his right. His gun was beneath him on his right side. He stated that the car's radio impeded his ability to move and he could not reach his weapon. He did not expect the suspect to try to shoot him or run to the left side of his patrol car, where he could be pinned by the car door. Severns said he did not expect to be in a position where he could not reach his gun. He bent over to avoid being shot.

Severns then heard Rivera tell the suspect to drop the weapon. He pushed the door open and saw the suspect with his arms up. The suspect took off again, but Rivera pursued and tackled him, at which point the suspect dropped the gun. Severns acknowledged that, at the time, he did not tell Rivera or anyone that the suspect tried to shoot him. He said his head was cloudy.

Severns further testified that he knew that he could have charged the suspect with certain criminal offenses, such as attempting to shoot a police officer, but he did not follow up or contact anyone about doing so. He claimed he was waiting for a detective to call him. He said it was not his responsibility to ensure the detective had the correct charges.

Rivera testified that on December 25, 2010, he received the same dispatch call that Severns received and he responded to the suspect's reported location in his patrol car. Rivera saw the suspect with his hand over the barrel of a gun and

he gave chase. He grabbed the suspect's waistband, but the suspect continued to run. Rivera pursued the suspect and, as he came around a corner, he saw the front of Severns's car with the suspect coming around the driver's side. Rivera said the suspect pointed a gun at Severns, who was within an arm's length of the weapon.

Rivera did not know if the suspect had drawn the hammer back and he did not hear the gun fire. Inostroza arrived and ordered the suspect to drop the weapon. The suspect complied. Rivera transported the suspect to the detective bureau, and the suspect was charged with weapons and drug offenses.

In January 2011, Severns was laid off and received unemployment compensation benefits. He returned to work in April 2011. He did not tell anyone about the incident on December 25, 2010, until sometime in April 2012, when he consulted an attorney. The attorney referred him to a doctor, who made a diagnosis of Post-Traumatic Stress Disorder (PTSD). Severns continued to work full duty until October 11, 2012, when he applied for accidental disability retirement benefits.

The ALJ filed an initial decision dated September 4, 2018. The ALJ found that Severns and Rivera were both credible witnesses. The ALJ wrote:

> Rivera was in hot pursuit of the suspect with the handgun. [Severns] was also actively pursuing the

suspect and was able to use his patrol vehicle to cut off the suspect in the alleyway as he was being pursued by Rivera and Inostraza. The suspect did not act as [Severns] had anticipated, and leaped over the hood. The suspect pointed the handgun at [Severns] and [Severns] heard two clicks. At that moment, [Severns] was unable to reach his weapon and was in fear for his life. When Rivera finally arrived at the scene, Rivera saw the suspect pointing the weapon at [Severns], although he heard no clicks of the weapon. [Severns] was then able to open the car door to assist in the arrest. [Severns] did not follow up with the detective who was responsible for charging the suspect.

The ALJ applied the standards for accidental disability retirement benefits under Richardson v. Board of Trustees, Police & Firemen's Retirement System, 192 N.J. 189 (2007), and Patterson v. Board of Trustees, Police & Firemen's Retirement System, 194 N.J. 29 (2008). The ALJ found that Severns had a disabling mental injury as a direct result of experiencing a terrifying or horror-inducing event that involved actual or threatened death or serious injury.

The ALJ concluded, however, that Severns did not meet the criteria for accidental disability retirement benefits because the December 25, 2010 encounter with the armed suspect was not "undesigned and unexpected." The ALJ explained that

[Severns] was acting in the regular performance of his duties with his weapon in its usual location when he assisted other officers in attempting to apprehend an armed suspect. While the suspect may have behaved in

6

a way that [Severns] had not anticipated, he was, after all, a suspect seeking to elude apprehension. Although [Severns] was not able to reach his weapon, no evidence indicated this was anything other than his position in the seat of the vehicle, which is not undesigned or unexpected. . . .

Severns filed exceptions to the ALJ's initial decision and the Attorney General filed a response. The Board issued its final decision on October 17, 2018, and adopted the ALJ's initial decision. This appeal followed.

On appeal, Severns argues that the Board erred as a matter of law by adopting the ALJ's decision because the ALJ incorrectly determined that the traumatic event of December 25, 2010, was not "undesigned and unexpected." He contends the Board's decision is inconsistent with Mount v. Board of Trustees, Police and Firemen's Retirement System, 233 N.J. 402 (2019). He further argues that Board's decision was arbitrary, capricious, and unreasonable and not supported by sufficient credible evidence in the record.

II.

The standard of review that applies in an appeal from a final decision of an administrative agency is limited. Russo v. Bd. of Trustees, Police and Firemen's Ret. Sys., 206 N.J. 13, 27 (2011) (citing In re Herrmann, 192 N.J. 19, 27 (2007)). We will not reverse an administrative decision "unless there is a clear showing that it is arbitrary, capricious, or unreasonable, or that it lacks fair

7

support in the record." Ibid. (citing Herrmann, 192 N.J. at 27-28). We are not, however, "bound by an agency's interpretation of a statute or its determination of a strictly legal issue." Ibid. (quoting Mayflower Sec. Co. v. Bureau of Sec., 64 N.J. 85, 93 (1973)). We review an agency's interpretation of a statute or case law de novo. Ibid. (citing Toll Bros., Inc. v. Twp. of W. Windsor, 173 N.J. 502, 549 (2002)).

N.J.S.A. 43:16A-7(1) governs the issuance of accidental disability retirement benefits for members of the PFRS. The statute provides that:

> [u]pon the written application by a member in service, by one acting in his behalf or by his employer any member may be retired on an accidental disability retirement allowance; provided, that the medical board, after a medical examination of such member, shall certify that the member is permanently and totally disabled as a direct result of a traumatic event occurring during and as a result of the performance of his regular or assigned duties and that such disability was not the result of the member's willful negligence and that such member is mentally or physically incapacitated for the performance of his usual duty and of any other available duty in the department which his employer is willing to assign to him.
>
> [N.J.S.A. 43:16A-7(1).]

To qualify for accidental disability retirement benefits, a member of the PFRS must establish

1. that he is permanently and totally disabled;

8

2. as a direct result of a traumatic event that is

　　a. identifiable as to time and place,

　　b. undesigned and unexpected, and

　　c. caused by a circumstance external to the member (not the result of pre-existing disease that is aggravated or accelerated by the work);

3. that the traumatic event occurred during and as a result of the member's regular or assigned duties;

4. that the disability was not the result of the member's willful negligence; and

5. that the member is mentally or physically incapacitated from performing his usual or any other duty.

[Richardson, 192 N.J. at 212-13 (citing N.J.S.A. 43:16A-7(1)).]

In Patterson, the Court held that a "permanent mental injury caused by a mental stressor without any physical impact can satisfy the Richardson standard." 194 N.J. at 48. The Court stated that this

means that a permanently disabling mental injury, that is the direct result of a mental stressor that is identifiable as to time and place, undesigned and unexpected, external to the member (not the result of pre-existing disease that is aggravated or accelerated by the work), that occurred during and as a result of the member's duties, and was not the result of the member's willful negligence, can qualify the member for an accidental disability retirement benefit.

[Ibid.]

The Court further explained that to qualify, "[t]he disability must result from direct personal experience of a terrifying or horror-inducing event that involves actual or threatened death or serious injury, or a similarly serious threat to the physical integrity of the member or another person. Id. at 34. The Court stated that this standard is to ensure that the claimed traumatic event "is not inconsequential but is objectively capable of causing a reasonable person in similar circumstances to suffer a disabling mental injury." Ibid.

III.

We are convinced there is sufficient credible evidence in the record to support the Board's determination that Severns's encounter with the armed suspect on December 25, 2010, was not a traumatic event that was "undesigned and unexpected." Severns's job description states he was responsible for "[a]pprehend[ing] and subdu[ing] suspects by chasing them on foot, or in a patrol car and by using physical force and applying handcuffs, if necessary, in order to take a suspect into custody and to prevent injury to the officer or others." Severns's job description further requires a patrolman to "[a]ttempt[] to disarm persons threatening others with a weapon by using calming conversation and obtaining assistance, in order to neutralize a dangerous situation."

Furthermore, at the hearing, Severns testified that during his seven or eight years as a patrolman, he typically responded once a week to calls involving armed suspects. He also testified that he chased armed suspects approximately four times a month, one or two times a week. Severns's job description and his experiences pursuing individuals armed with weapons supports the Board's conclusion that Severns's interaction with the armed suspect on December 25, 2010, was not "undesigned and unexpected."

Severns argues that the encounter was "undesigned and unexpected" because he did not expect the suspect would run on the driver's side of his police vehicle. However, the suspect was endeavoring to avoid apprehension. Under the circumstances, a patrolman with Severns's training and experience should reasonably expect that a suspect could choose any path of escape.

Moreover, since the suspect was brandishing a weapon, a patrolman with Severns's training and experience should reasonably expect that the suspect might shoot or attempt to shoot the weapon. Severns asserts he did not anticipate he would be unable to access his own weapon. However, in a fast-moving chase of an armed suspect, a patrolman should expect that he might find himself in a position where he would be unable to protect himself by accessing his weapon.

Russo supports the Board's finding that Severns's encounter with the armed suspect was not "undesigned or unexpected." In that case, Russo, a policeman in his first year on the force, responded with other officers to a house fire. Russo, 206 N.J. at 19. The officers were ordered to enter the house and they were able to rescue three individuals. Ibid.

However, the intense heat and smoke prohibited the officers from rescuing a man who was crying out for help and then died. Ibid. The victim's family confronted Russo and the other officers and blamed them for the man's death. Id. at 20. Russo was treated for smoke inhalation. Ibid. He later began to suffer psychological difficulties and was diagnosed with PTSD. Ibid.

Russo filed an application for accidental disability retirement benefits. Id. at 21. The Board determined that the incident was not a traumatic event under N.J.S.A. 43:16A-7. Ibid. The Board found that Russo failed to show that the incident was objectively capable of causing a disabling mental injury to a reasonable person in similar circumstances, as required by Patterson. Ibid.

The Supreme Court held that Russo had experienced a qualifying traumatic event under Patterson. Id. at 33-34. The Court noted, however, that not every person who experiences such an event will automatically qualify for accidental disability retirement benefits. The Court explained that

an employee who experiences a horrific event within his job description and for which he has been trained will be unlikely to pass the "undesigned and unexpected" test. Thus, for example, an emergency medical technician who comes upon a terrible accident involving life-threatening injuries or death, will have experienced a Patterson-type horrific event, but will not satisfy Richardson's "undesigned and unexpected" standard because that is exactly what his training has prepared him for.

[Id. at 32-33 (citing Richardson, 192 N.J. at 212-13).]

Here, Severns was trained to chase and apprehend armed suspects and he had experience in doing so. Severns's training and experience should have prepared him for an encounter in which an armed suspect will point a gun at him and attempt to shoot the weapon. In such a situation, the officer might not be able to access his weapon. However, such an event is not "undesigned or unexpected." Therefore, Severns failed to meet the criteria under Richardson for accidental disability retirement benefits.

IV.

Severns further argues that the Board erred by failing to consider Mount, where the Court held that an injured member's job description and training are not dispositive of whether a traumatic event was "undesigned and unexpected." 233 N.J. at 427. In that case, officer Mount was dispatched to a serious motor vehicle accident. Id. at 409. Smoke was coming from the car, which was

extensively damaged.  Ibid.  Mount saw what appeared to be the arm of a human being hanging from a window.  Ibid.  Bystanders screamed at Mount, telling him to "do something."  Ibid.

Mount was standing near the vehicle when it exploded into flames.  Ibid. He lacked firefighting equipment, and he waited in his patrol car while the firefighters extinguished the fire.  Id. at 410.  Thereafter, Mount returned to the car and saw three human bodies inside.  Ibid.  He said the victims' skin had "melted."  Ibid.  Mount stated that he could smell and taste the burning flesh. Ibid.

Mount thereafter began to experience psychological difficulties and was diagnosed with PTSD.  Id. at 410-11.  He applied for accidental disability retirement benefits.  Id. at 411.  The Board denied the application, finding that while Mount had experienced a "horrific event," it was an event within Mount's job description and therefore not "undesigned or unexpected."  Id. at 413.

In Mount, the Court clarified its observation in Russo that "'an employee who experiences a horrific event which falls within his job description and for which he has been trained will be unlikely to pass the 'undesigned and unexpected' test.'"  Id. at 427 (citing Russo, 206 N.J. at 33).  The Court stated that the comment in Russo

should not be construed to mean that the inquiry regarding whether an event is "undesigned and unexpected" is resolved merely by reviewing the member's job description and the scope of his or her training. In a given case, those considerations may weigh strongly for or against an award of accidental disability benefits. To properly apply the Richardson standard, however, the Board and a reviewing court must carefully consider not only the member's job responsibilities and training, but all aspects of the event itself. No single factor governs the analysis.

[Ibid.]

The Court held that Mount had experienced an "undesigned and unexpected" event. Id. at 427-28. Mount had experienced "a catastrophic accident at close range." Id. at 427. He lacked firefighting equipment, and bystanders were demanding that he rescue the persons in the damaged vehicle. Ibid. The car burst into flames and Mount observed the victims' bodies in the interior of the car. Ibid.

The Court noted that as a result of his job description, training, and prior experience, Mount could anticipate being called to a serious or fatal accident. Ibid. Moreover, at times, Mount would be expected to remove victims from a damaged vehicle. Ibid. The Court explained, however, that Mount was not "trained to combat, unassisted, an explosion of such magnitude experienced at such a close range. Ibid. The Court noted that Mount did not have any

15                                                                          A-1418-18T4

firefighting equipment or protective gear. Id. at 427-28. "[H]e was helpless in the face of a terrible tragedy." Id. at 428. The Court concluded that the circumstances were "extraordinary." Ibid.

We are convinced that Severns's reliance upon Mount is misplaced. As we have explained, in this case, the Board did not base its decision solely upon Severns's job description. The Board also considered all aspects of the event, as required by Mount. Furthermore, the circumstances of Severns's encounter with the armed suspect on December 25, 2010, were not "extraordinary" like the circumstances described in Mount. Severns's encounter with the armed suspect on December 25, 2010, was not "undersigned and unexpected."

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION