NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-1041-13T1

JAMES MORAN,

     Petitioner-Appellant,

v.

BOARD OF TRUSTEES, POLICE AND
FIREMEN'S RETIREMENT SYSTEM,

     Respondent-Respondent.

APPROVED FOR PUBLICATION

November 25, 2014

APPELLATE DIVISION

Argued October 15, 2014 - Decided November 25, 2014

Before Judges Reisner, Koblitz and Haas[1].

On appeal from the Board of Trustees, Police and Firemen's Retirement System, PFRS #3-10-44221.

John D. Feeley argued the cause for appellant (Feeley & LaRocca, LLC, and The Blanco Law Firm, LLC, attorneys; Pablo N. Blanco, of counsel and on the brief).

Eileen S. DenBleyker, Senior Deputy Attorney General, argued the cause for respondent (John J. Hoffman, Acting Attorney General, attorney; Melissa H. Raksa, Assistant Attorney General, of counsel; Nels J. Lauritzen, Deputy Attorney General, on the brief).

---

[1] Judge Haas did not participate in oral argument.  However, with consent of counsel he has joined in this opinion.  R. 2:13-2(b).

The opinion of the court was delivered by

REISNER, P.J.A.D.

James Moran, a firefighter, heroically saved two victims from a burning building by kicking in the building's front door. Although Moran suffered disabling injuries in this incident, the Board of Trustees of the Police and Firemen's Retirement System (Board) denied his application for an accidental disability retirement pension. Applying <u>Richardson v. Board of Trustees</u>, <u>Police and Firemen's Retirement System</u>, 192 <u>N.J.</u> 189, 212-13 (2007), the Board found that Moran's disability was not due to a traumatic event within the meaning of <u>N.J.S.A.</u> 43:16A-7, because the incident was "not 'unexpected and undesigned.'"  We disagree and reverse.

I

A.

As background, it is helpful to begin with the pension statute, as construed in <u>Richardson</u>.  Entitlement to an accidental disability pension requires proof that, "during and as a result of" performing "his regular or assigned duties," a member suffered a disabling injury "as a direct result of a traumatic event."  <u>N.J.S.A.</u> 43:16A-7(1).  To put these terms in context, we quote the statute's proof requirements:

> the member is permanently and totally
> disabled as a direct result of a traumatic

event occurring during and as a result of the performance of his regular or assigned duties and that such disability was not the result of the member's willful negligence and that such member is mentally or physically incapacitated for the performance of his usual duty and of any other available duty in the department which his employer is willing to assign to him.

[Ibid.]

In Richardson, the Court clarified the meaning of the term "traumatic event," stating that "a traumatic event is essentially the same as what we historically understood an accident to be — an unexpected external happening that directly causes injury and is not the result of pre-existing disease alone or in combination with work effort." Richardson, supra, 192 N.J. at 212. The Court found that in using the term "traumatic event," the Legislature did not mean generally to raise the bar for injured employees to qualify for accidental disability pensions. Id. at 210-11. Rather, the Legislature intended "to excise disabilities that result from pre-existing disease alone or in combination with work effort from the sweep of the accidental disability statutes and to continue to allow recovery for the kinds of unexpected injurious events that had long been called 'accidents.'" Id. at 192. In making that point, the Court noted that "some of our cases failed to recognize that critical limitation in purpose and persisted in

the entirely wrong notion that the term traumatic event was intended, in itself, to more significantly narrow the meaning of accident." Id. at 210-11.

The Court then set forth the factors a pension system member must prove to obtain accidental disability benefits:

> 1. that he is permanently and totally disabled;
>
> 2. <u>as a direct result of a traumatic event that is</u>
>
> a. identifiable as to time and place,
>
> b. <u>undesigned and unexpected</u>, and
>
> c. caused by a circumstance external to the member (not the result of pre-existing disease that is aggravated or accelerated by the work);
>
> 3. that the traumatic event occurred during and as a result of the member's regular or assigned duties;
>
> 4. that the disability was not the result of the member's willful negligence; and
>
> 5. that the member is mentally or physically incapacitated from performing his usual or any other duty.
>
> [Id. at 212-13 (emphasis added).]

Prior to Moran's administrative hearing, the parties stipulated that Moran met all of the above-cited criteria, except one. They disagreed as to whether the incident that caused his disability "was undesigned and unexpected."

Undisputed evidence at the hearing established that firefighting duties were divided between two different units, each of which would arrive at a fire in a different fire truck.[2] Breaking into burning buildings was not Moran's normal unit assignment. He was part of an "engine company" whose role was to "take[] the hoses into the [burning] building . . . and put[] out the fire." A different unit, the "truck company," was responsible for forcing entry into a burning structure and rescuing any occupants. The truck company carried various special equipment specific to those functions. The two units were supposed to respond to a fire scene at the same time.

At about 2:00 a.m., Moran's engine company responded to a fire in what was reported to be a vacant, boarded-up house. Hence, no one expected that it would be necessary to rescue anyone inside. Instead, the plan was to mount a "defensive attack" to keep the fire from spreading to other buildings. When Moran started fighting the fire, the truck company had not yet arrived on the scene. Moran stated that when he arrived, he observed a "heavy, heavy body of fire" in the building, and his

---

[2] At the Office of Administrative Law hearing, most of the facts were stipulated. Moran testified briefly, as did a fire captain who had been present at the fire. The Board presented no witnesses.

captain called "emphatically for a truck company for the building."

As Moran was unrolling the hose toward the building, which was engulfed in flames, he unexpectedly heard screams from people trapped inside the structure. He testified that a truck company would have had special equipment, such as a "[h]ydraulic ram, a battering ram, [and a] haligon tool with an ax." He testified that he had none of those tools with him and typically would not have them. But, because he heard people screaming inside the building, he used his "shoulder, leg and back" to break down the door. He testified that the door "was well fortified, but [he] eventually did" break through it.

Although his fire training involved using tools such as a "hydraulic ram" to break down doors, not forcing entry with his body, Moran testified that if he had not opened the door, the people inside would have died. He also testified that, but for the unexpected presence of the victims in the burning building, and the unexpected absence of the truck company, he would not have tried to open the door.

A fire captain, who was present at the scene as Moran's commanding officer, corroborated Moran's testimony. On cross-examination, the fire captain stated that the only tool the engine company had on its truck which the truck company would

6

also have had was an "ax." However, he stated that the ax was not available to Moran when this emergency presented itself, because Moran "was grabbing the hose line at the time which [was what] he was supposed to be doing."

The Board presented no evidence to contradict Moran's proofs that he encountered an unexpected life-and-death emergency for which he was carrying no tools. The Board did not present testimony from any other firefighter that, faced with the same situation, he or she would have gone back to the truck and looked for an ax, leaving the fire victims to their fate in the meantime. Nor did the Board present evidence that the ax on the truck was even the appropriate tool to use in breaking down a fortified door.

In a lengthy opinion, the administrative law judge (ALJ) found both Moran and the fire captain to be credible witnesses. The ALJ found that the incident involved an unexpected situation which required Moran to respond in a manner unanticipated by his training and experience.

> [P]etitioner was dispatched to a burning, purportedly vacant house as a member of the fire department's engine company that advances hoses to extinguish fires and relies upon the truck company to provide access and perform search-and-rescue operations. Quite unexpectedly, as petitioner performed his assigned duties and prepared an external defensive attack to contain the raging blaze, he heard voices

from within the boarded building. Also unexpectedly, and contrary to standard procedure, the truck company was not on the scene. For the first time in his ten-year career as a firefighter, he was confronted with a raging fire in a purportedly vacant house that actually had occupants trapped inside, and the fire squad that provides access and performs rescue operations was unpredictably absent. But for that sudden and emergent circumstance, he would not have used and injured his body in entering the building.

Relying on <u>Richardson</u>, the ALJ rejected the Board's argument that the incident was not undesigned or unexpected because it resulted from Moran's intentional act of breaking down the door. The ALJ reasoned that Moran was responding to a "sudden and emergent circumstance" that required him to respond with unanticipated extreme physical exertion, causing his injury.

In its decision, the Board adopted the ALJ's factual findings. However, the Board rejected his legal conclusions, reasoning that "[s]imply kicking in a door or intentionally using one's back to force entry does not constitute an 'unexpected happening,' as Mr. Moran's very intent in partaking in these happenings would necessarily render such happenings to be expected."

The Board also reasoned that, according to the Civil Service job description, a fire fighter's job duties included

rescuing people and, hence, Moran "did intentionally perform a duty within the scope and performance of his regular duties for which he had been specifically trained."

> Here, the work activity itself was not undesigned or unexpected. Mr. Moran was disabled as a direct result of performing the work he intentionally set out to do. When he heard screams from inside the building, he intentionally slammed his body against a door in order to force it open. These facts do not lend themselves to any unexpected activity or accident. . . . Mr. Moran's disabling injury, while unfortunate, was caused by ordinary and intended, if dire, work effort -- not by an undesigned and unexpected external mishap.

II

On this appeal, we defer to the agency's factual findings, but we owe no deference to its legal conclusions, "particularly when 'that interpretation is inaccurate or contrary to legislative objectives.'" Russo v. Bd. of Trs., Police & Firemen's Ret. Sys., 206 N.J. 14, 27 (2011) (quoting G.S. v. Dep't of Human Servs., Div. of Youth & Family Servs., 157 N.J. 161, 170 (1999)). In this case, we are persuaded that in denying accidental disability benefits to a firefighter whose heroic response to an undesigned and unexpected traumatic event left him disabled, the Board has misconstrued Richardson and

reached a result at odds with the legislative intent in adopting the "traumatic event" standard.[3]

As previously noted, the 1964 amendments to the disability pension statute were not intended to make it generally more difficult for injured employees to obtain an accidental disability pension. Richardson, supra, 192 N.J. at 210-11. Rather, the amendments were intended to weed out disabilities stemming from a member's pre-existing medical condition, even if the condition was exacerbated by a work incident. Id. at 211. Thus, a firefighter with a heart condition could not collect an accidental disability pension for a disabling heart attack suffered while fighting a fire, and a custodian likewise is not entitled to such benefits if he suffers a heart attack while performing his janitorial duties. See Cattani v. Bd. of Trs., Police & Firemen's Ret. Sys. 69 N.J. 578, 586-87 (1978); Russo v. Teacher's Pension & Annuity Fund, 62 N.J. 142, 154 (1973).

---

[3] This is not the first time the Board's cramped view of the Richardson standards has resulted in an unjustified denial of benefits. See Russo, supra, 206 N.J. at 26-27 (rejecting Board's denial of benefits to a police officer, who suffered emotional trauma after being unexpectedly called upon to rescue five victims); Brooks v. Bd. of Trs., Public Emps.' Ret. Sys., 425 N.J. Super. 277, 283-84 (App. Div. 2012) (rejecting the Board's conclusion that a teacher did not suffer an "undesigned and unexpected" accident because "he should have anticipated the dangers involved" in helping students carry a heavy object).

In this case, the Board determined that Moran's injury did not qualify him for an accidental disability pension because it occurred while he was conducting one of his expected work-related duties, rescuing fire victims. The Board further reasoned that what occurred was not an "accident" because Moran intended to throw his body against the door. We conclude that the Board's decision misread Richardson, misapplied the statute, and took an unduly narrow view of what constitutes an "unexpected and undesigned" traumatic event.

We harken back to Richardson, in which the Board made a similar error in denying an application from a corrections officer injured during a scuffle with an inmate:

> The Board contends that because subduing an inmate is part of the anticipated work of a corrections officer and was not unexpected or unintended, Richardson cannot satisfy the traumatic event standard. That is a misreading of the statute, which requires that the traumatic event occur "during and as a result of the performance of [the member's] regular or assigned duties." To be sure, when the "normal stress and strain" of the job combines with a pre-existing disease to cause injury or degeneration over time, a traumatic event has not occurred. See Cattani, supra, 69 N.J. at 585; Russo, supra, 62 N.J. at 151. That is quite different from saying that a traumatic event cannot occur during ordinary work effort. Indeed it can. A policeman can be shot while pursuing a suspect; a librarian can be hit by a falling bookshelf while re-shelving books; a social worker can catch her hand in

the car door while transporting a child to court. Each of those examples is identifiable as to time and place; undesigned and unexpected; and not the result of pre-existing disease, aggravated or accelerated by the work. Thus, each meets the traumatic event standard. So long as those members also satisfy the remaining aspects of the statute, including total and permanent disability, they will qualify for accidental disability benefits.

In sum, the fact that a member is injured while performing his ordinary duties does not disqualify him from receiving accidental disability benefits; some injuries sustained during ordinary work effort will pass muster and others will not. <u>The polestar of the inquiry is whether, during the regular performance of his job, an unexpected happening, not the result of pre-existing disease alone or in combination with the work, has occurred and directly resulted in the permanent and total disability of the member.</u>

[<u>Id.</u> at 213-14 (alteration in original) (final emphasis added).]

We agree with the ALJ that in this case the traumatic event must be viewed with a wider lens than the one the Board applied. The undesigned and unexpected event here was the combination of unusual circumstances that led to Moran's injury: the failure of the truck unit to arrive, and the discovery of victims trapped inside a fully engulfed burning building, at a point when Moran did not have available to him the tools that would ordinarily be

used to break down the door.[4] As a result, he was forced to carry out his paramount duty to rescue fire victims, by manually kicking in the door. Had he not responded immediately to break down the door, the victims would have died. That was Moran's unrebutted, credible testimony.

While this was not a classic "accident" in the sense that the house did not collapse on Moran, nor did he trip while carrying a fire hose, it was clearly an unexpected and undesigned traumatic event that resulted in Moran's suffering a disabling injury while performing his job. Viewed in context, the injury was also caused by an event, or series of events, "external" to Moran. Richardson, supra, 192 N.J. at 212-13; see Brooks, supra, 425 N.J. Super. at 283. By analogy, had Moran become hopelessly trapped by fire on an upper floor of the house, and saved himself by jumping out a window thereby suffering disabling injuries, he would not be disqualified for benefits because he "intentionally" jumped.

Nor was this a situation in which Moran should have expected to find himself. We acknowledge that in Russo, supra, 206 N.J. at 33, the Court reasoned that an ambulance squad

---

[4] We reject the Board's backhanded criticism of Moran, in referring to his "deviating" from his training in failing to use the ax on the truck. The Board presented no testimony at the hearing to dispute the captain's assertion that the ax was not available to Moran at the time he needed it.

member disabled by emotional trauma after coming upon a horrible auto accident "will not satisfy <u>Richardson</u>'s 'undesigned and unexpected' standard because that is exactly what his training has prepared him for." <u>Ibid.</u> However, this case is different.

The Board, having adopted the ALJ's factual findings, was obligated to render its legal conclusions based on those findings. In this case, the ALJ found that Moran's training had not prepared him to break into burning buildings without the battering rams and other specialized equipment used by the truck company. Indeed, there was no evidence to the contrary. Further, as the ALJ found, no equipment was available to Moran at the moment he had to make the life-or-death decision that confronted him. Nothing in the history of the pension statute, as exhaustively reviewed in <u>Richardson</u>, suggests that the Legislature would have intended to deny Moran an accidental disability pension in these circumstances.

Accordingly we reverse the Board's decision and remand with direction to grant Moran an accidental disability pension.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1041-13T1