**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1611-16T1

ADAM TOOPS,

    Petitioner-Appellant,

v.

BOARD OF TRUSTEES, POLICE
AND FIREMEN'S RETIREMENT
SYSTEM,

    Respondent-Respondent.

_____

Argued April 19, 2018 — Decided July 18, 2018

Judges Simonelli, Haas and Gooden Brown.

On appeal from the Board of Trustees, Police
and Firemen's Retirement System, Docket No.
3-10-049816.

Patrick P. Toscano, Jr., argued the cause for
appellant (The Toscano Law Firm, LLC,
attorneys; Patrick P. Toscano, Jr., on the
brief).

Robert S. Garrison, Jr., Deputy Attorney
General, argued the cause for respondent
(Gurbir S. Grewal, Attorney General, attorney;
Melissa H. Raksa, Assistant Attorney General,
of counsel; Robert S. Garrison, Jr., on the
brief).

PER CURIAM

Adam Toops appeals from a December 6, 2016 final decision of the Board of Trustees of the Police and Firemen's Retirement System (Board), denying his application for accidental disability retirement benefits. In so doing, the Board adopted the factual findings of the Administrative Law Judge (ALJ) establishing that Toops suffered disabling injuries in a 2009 incident, but rejected the ALJ's legal conclusion that Toops' disability was due to a traumatic event within the meaning of N.J.S.A. 43:16A-7. Because we agree with the Board, we affirm.

As background, N.J.S.A. 43:16A-7(1) authorizes an award of accidental disability benefits to a Police and Firemen's Retirement System (PFRS) member provided that:

> the member is permanently and totally disabled as a direct result of a traumatic event occurring during and as a result of the performance of his regular or assigned duties and that such disability was not the result of the member's willful negligence and that such member is mentally or physically incapacitated for the performance of his usual duty and of any other available duty in the department which his employer is willing to assign to him.

In Richardson v. Board of Trustees, Police and Firemen's Retirement System, 192 N.J. 189 (2007), the Court clarified the meaning of the term "traumatic event," and set forth a five-pronged

standard mandating that a pension system member seeking accidental

disability benefits prove:

> 1. that he is permanently and totally disabled;
>
> 2. as a direct result of a traumatic event that is
>
>> a. identifiable as to time and place,
>>
>> b. undesigned and unexpected, and
>>
>> c. caused by a circumstance external to the member (not the result of pre-existing disease that is aggravated or accelerated by the work);
>
> 3. that the traumatic event occurred during and as a result of the member's regular or assigned duties;
>
> 4. that the disability was not the result of the member's willful negligence; and
>
> 5. that the member is mentally or physically incapacitated from performing his usual or any other duty.
>
> [Id. at 212-13.]

In November 2013, Toops, then a police officer, applied for

accidental disability retirement benefits based on injuries he

sustained on July 22, 2009, while "climbing over fences and

structures[,]" "searching for armed robbers" in the area. In the

application, Toops stated that while "attempting to climb over

[the] last fence[,]" his "right arm went numb" and he "had severe

pain." Toops later sought medical treatment, was diagnosed with a cervical disc herniation at C5-C6 with radiculopathy, and underwent epidural injections and surgeries, resulting in a permanent orthopedic disability.

On December 9, 2014, the Board denied Toops' application for accidental disability benefits based on the July 22, 2009 incident and an unrelated January 18, 2011 incident.[1] Initially, the Board found "no evidence" of Toops' involvement in a July 22, 2009 incident. The Board then determined that although Toops established some of the necessary elements under Richardson for accidental disability benefits in connection with the January 18, 2011 incident, Toops was eligible for ordinary disability benefits only because "the medical documentation provided indicate[d] that his disability [was] the result of a pre-existing disease alone or a pre-existing disease that [was] aggravated or accelerated by the work effort." Toops filed an administrative appeal and the matter was transmitted to the Office of Administrative Law (OAL) as a contested case.

During the OAL hearing conducted on November 30, 2015, Toops testified that he had been employed by the Montclair Police

_____

[1] The January 18, 2011 incident involved Toops slipping and falling on ice in the parking lot of the Montclair Police Department. He sustained injuries to his neck, right shoulder blade, and right arm.

A-1611-16T1

Department for approximately fourteen years, beginning in 2000. He spent the first thirteen years as a patrol officer and then was promoted to a detective. At approximately 3:00 p.m. on July 22, 2009, while wearing courtroom attire rather than tactical clothing,[2] Toops was directed along with all other officers to assist West Orange police in apprehending armed robbery suspects who fled into their jurisdiction. Toops responded with another detective, James Milano. Once at the scene, Toops was provided a bullet-proof vest and began canvassing the area.

The radio transmissions led Toops and Milano through backyards, climbing approximately thirty fences in search of the suspects. When Toops attempted to climb one fence in particular, which he described as a six-foot chain link fence, he "slipped on it several times trying to follow [Milano]." Toops eventually navigated over the fence by using his body, shoulder, and neck. However, once he got over the fence, he experienced "extreme pain" in his arm and explained to Milano that, due to the pain, he could not continue the search. At that point, Toops returned to headquarters and sought medical treatment for his injuries a few weeks later. Although Toops did not initially submit an injury

---

[2]   Toops testified that he was not in uniform and was wearing normal dress shoes.

report,[3] Milano submitted a report to the department and to the Board, confirming Toops' account.

At the hearing, the parties stipulated to Toops being 75% disabled. The parties also stipulated to the contents of a January 2014 e-mail sent to the Division of Pensions by Captain Scott Roberson, in his capacity as the head of the Montclair Police Department's Internal Affairs, discrediting Toops' account. The email indicated that contrary to departmental procedures, there were no incident or injury reports evidencing Toops' involvement in or sustaining an injury as a result of the pursuit.

On cross-examination, Toops explained that his name did not specifically appear in the incident report because the entire Detective Bureau responded, and his injury report was ultimately filed internally within the Detective Bureau, not with Roberson. Toops testified further that Roberson did not respond to the scene at the time in question and was biased against him because he disregarded Roberson's directive not to file a workers' compensation claim for the injury. Toops explained that he had to file a workers' compensation claim because his private insurance would not cover surgeries for work-related injuries. In addition,

---

[3] Toops explained that he did not submit an injury report because he initially believed the pain stemmed from an unrelated prior injury.

Toops was cross-examined on other injuries he had sustained while he was a police officer, including the January 18, 2011 incident and a November 29, 2001 injury he sustained in a house fire, for which he submitted an application for disability retirement benefits in January 2005 that was later withdrawn.

In his initial decision issued on January 4, 2016, the ALJ found Toops' testimony to be "extremely credible and consistent with other supporting documentation, including Milano's submission to the . . . Board[.]"  The ALJ rejected Roberson's account as "not credible" and "not based on any first-hand knowledge of whether Toops was involved in the incident of July 22, 2009." Thus, the ALJ found "strong evidence in the record" that Toops "suffered an injury while performing a canvas . . . in response to a call for assistance . . . as part of his duties, which left him disabled."

Next, relying on Moran v. Board of Trustees, Police and Firemen's Retirement System, 438 N.J. Super. 346, 354 (App. Div. 2014) and Brooks v. Board of Trustees Public Employees Retirement System, 425 N.J. Super. 277 (2012), the ALJ determined that "there was clearly an accident or external event, . . . which caused the injury to [Toops]."  The ALJ explained that Toops sustained the injury "while and from performing exactly the task he undertook and intended to perform: searching an area for suspects of an

armed robbery." According to the ALJ, "[w]hile the injury was certainly an unanticipated consequence, it appears to be an unanticipated consequence of strenuous work activity" and was the result of an accidental occurrence. Citing Richardson, the ALJ concluded that because "the incident of July 22, 2009, which caused [Toops'] disability . . . was undesigned and unexpected[,]" Toops "met his burden in demonstrating eligibility for accidental disability retirement benefits." Accordingly, the ALJ recommended reversing the Board's denial and awarding Toops accidental disability retirement benefits.

PFRS filed exceptions and the Board remanded the matter to the ALJ for additional fact-finding. Specifically, the Board found the ALJ's credibility determination of Roberson to be "flawed" because the ALJ never heard Roberson's testimony, despite his availability. In addition, the Board remanded for "medical testimony on behalf of Toops to establish and allocate causation of disability related to the July 22, 2009, incident."

On June 21, 2016, the ALJ conducted a second hearing during which Roberson testified via Skype without objection. Roberson stated that based on the paperwork he had in his possession, there was no documentation that showed Toops was injured in the July 2009 incident, contrary to departmental protocol requiring the submission of an injury report within twenty-four hours of

sustaining an injury.  He admitted, however, that Toops was not under his command, and that he was aware that Milano had witnessed the injury and that Toops had filed a workers' compensation claim as a result of the 2009 incident.

On November 2, 2016, the ALJ issued an initial decision on the remand, finding that because "Roberson's testimony was based solely on the documentation which 'should' have been submitted," rather than "first-hand knowledge[,]" it "did not provide any tangible light on whether the event of July 22, 2009 happened." "[L]eft with the credible testimony of Toops, supported by Milano's documentation[,]" the ALJ reiterated his prior findings and determined that "the conclusion made in the previous [i]nitial [d]ecision regarding the fact that the incident did occur . . . remain[ed] unchanged."  As to the medical testimony, the ALJ noted that PFRS conceded that if the Independent Medical Examiner were to testify, he would confirm that Toops was 75% disabled as a result of the July 22, 2009 incident, thereby obviating the need for medical testimony.

On December 6, 2016, after considering the ALJ's November 2, 2016 initial decision as well as the exceptions filed by the parties, the Board adopted the ALJ's factual findings that the July 2009 incident occurred and that 75% of Toops' total and permanent disability was directly attributable to the 2009

incident.  However, the Board rejected the ALJ's legal conclusion "that the incident was undesigned and unexpected" and determined that Toops was not entitled to accidental disability retirement benefits under the criteria established in Richardson.  The Board explained that "the work activity itself was not undesigned or unexpected, but was in fact strenuous work effort similar to Cattani [v. Board of Trustees, Police and Firemen's Retirement System, 69 N.J. 578 (1976)] and did not include an external event."

The Board elaborated further that

> Toops was performing his normal job duties by climbing a six-foot-tall fence in search of a suspect when he suddenly felt pain in his neck, right shoulder and body.  Pursuing suspects was a core duty of his employment, and one that is included within the job description for a police officer. . . . Similar to [Cattani] dragging hoses that were too heavy for him, . . . Toops was over exerting himself while he was attempting to climb the fence.  As a result of his physical exertions, he was injured performing the ordinary duties of his employment and is not eligible for [a]ccidental disability retirement [benefits].

This appeal followed.

On appeal, Toops argues that the "Board acted arbitrarily, capriciously, and unreasonably in concluding that Toops' July 22, 2009 incident was not 'undesigned and unexpected'" under Richardson.  Specifically, Toops asserts "the Board ignored critical facts of record in concluding that 'Toops was engaged in

10

the normal work effort of climbing a fence' when he was injured[,]" and "misinterpreted the meaning of 'undesigned and unexpected'" in "characteriz[ing] Toops' work activity on July 22, 2009 as ordinary strenuous work effort." According to Toops, as a detective, it was "not part of his ordinary or daily job duties to participate in manhunts or suspect chases or to scale . . . fences." Toops argues that the Board's reliance on Cattani "was seriously misplaced" as "[t]his case is more like Moran . . . ." We disagree.

"Our review of administrative agency action is limited." Russo v. Bd. of Trs., Police & Firemen's Ret. Sys., 206 N.J. 14, 27 (2011). Reviewing courts presume the validity of the "administrative agency's exercise of its statutorily delegated responsibilities." Lavezzi v. State, 219 N.J. 163, 171 (2014) (citation omitted). For those reasons, "an appellate court ordinarily should not disturb an administrative agency's determinations or findings unless there is a clear showing that (1) the agency did not follow the law; (2) the decision was arbitrary, capricious, or unreasonable; or (3) the decision was not supported by substantial evidence." In re Virtua-West Jersey Hosp. for a Certificate of Need, 194 N.J. 413, 422 (2008). "The burden of demonstrating that the agency's action was arbitrary, capricious or unreasonable rests upon the [party] challenging the

administrative action." In re Arenas, 385 N.J. Super. 440, 443-44 (App. Div. 2006) (citations omitted).

"[T]he test is not whether an appellate court would come to the same conclusion if the original determination was its to make, but rather whether the factfinder could reasonably so conclude upon the proofs." Brady v. Bd. of Review, 152 N.J. 197, 210 (1997) (quoting Charatan v. Bd. of Review, 200 N.J. Super. 74, 79 (App. Div. 1985)). "Where . . . the determination is founded upon sufficient credible evidence seen from the totality of the record and on that record findings have been made and conclusions reached involving agency expertise, the agency decision should be sustained." Gerba v. Bd. of Trs., Pub. Emps.' Ret. Sys., 83 N.J. 174, 189 (1980) (citation omitted). That said, appellate courts review de novo an agency's interpretation of a statute or case law. Russo, 206 N.J. at 27.

Toops challenges the Board's rejection of the ALJ's determination that he was entitled to accidental disability retirement benefits. Indeed, an agency's authority to reject and modify an ALJ's initial decision is limited. Specifically, pursuant to N.J.A.C. 1:1-18.6(b),

> [t]he order or final decision rejecting or modifying the initial decision shall state in clear and sufficient detail the nature of the rejection or modification, the reasons for it, the specific evidence at hearing and

12

interpretation of law upon which it is based
and precise changes in result or disposition
caused by the rejection or modification.

We are satisfied, however, that the Board comported with this legal mandate in its December 6, 2016 decision rejecting the ALJ's legal conclusion, and correctly determined that Toops' disability was not the direct result of a traumatic event that was undesigned or unexpected as contemplated in Richardson, but instead the result of strenuous work effort similar to Cattani.

In Richardson, the Court explained, that a traumatic event is "essentially the same as what we historically understood an accident to be—an unexpected external happening that directly causes injury and is not the result of pre-existing disease alone or in combination with work effort." 192 N.J. at 212. "In ordinary parlance, an accident may be found either in an unintended external event or . . . an unanticipated consequence of an intended external event if that consequence is extraordinary or unusual in common experience." Id. at 201 (quoting Russo, 62 N.J. at 154). The Court described "[t]he polestar of the inquiry" as "whether, during the regular performance of [one's] job, an unexpected happening, not the result of pre-existing disease alone or in combination with the work, . . . occurred and directly resulted in the permanent and total disability of the member." Id. at 214.

In <u>Cattani</u>, the Court reiterated its prior determination that a "'traumatic event' would ordinarily involve a mishap or accident involving the application of some kind of external force to the body or the violent exposure of the body to some external force." 69 N.J. at 586. The Court concluded that where the disability was the end result of a pre-existing medical condition, "work effort alone whether unusual or excessive, cannot be considered a traumatic event, even though it may have aggravated or accelerated the pre-existing disease." <u>Ibid.</u>

There, Cattani, a firefighter, responded to a fire, removed five lengths of heavy hoses from the engine, and dragged the hoses into place in order to extinguish the fire. <u>Id.</u> at 580-81. At the time, the fire department was undermanned and required those on duty to perform additional firefighting duties. <u>Ibid.</u> After the fire was extinguished, Cattani returned to the firehouse and became temporarily paralyzed in his arms and legs. <u>Id.</u> at 581. Ten days later, he began having recurring episodes and was diagnosed with a basilar artery occlusion secondary to a pre-existing condition of atherosclerosis and hyperlidemia. <u>Ibid.</u>

Cattani filed for accidental disability retirement benefits. <u>Id.</u> at 582. The medical proofs demonstrated that his underlying disease was aggravated by the added strain and effort exerted during the event in question. <u>Ibid.</u> The Board determined that

Cattani had not experienced a traumatic event and that his condition was the result of his pre-existing disease. Id. at 583. We reversed on the ground that the unusual and excessive work effort itself was the traumatic event. Ibid. The Supreme Court reversed our decision and reinstated the Board's decision, reasoning that the aggravation of pre-existing disease by any kind of work effort, usual or unusual, was not a traumatic event within the meaning of the statute. Id. at 586.

Here, we agree with the Board that, like Cattani, scaling fences while searching for suspects was clearly within the realm of Toops' duties as a police officer, notwithstanding the fact that he had been promoted to detective. He presented no evidence that this search was unusual or outside the scope of his employment, only that as a detective he was dressed in courtroom attire rather than tactical clothing. He also failed to show that his injury occurred due to some external event other than his strenuous work effort. The fence did not collapse or exhibit any type of defect, but rather, through Toops' own physical exertion of trying to lift himself over the fence, he sustained a permanent and disabling injury. We agree with the Board that sustaining an injury under these circumstances was not intended by the Legislature to be considered a traumatic event, entitling Toops to accidental disability retirement benefits.

A-1611-16T1

Toops' reliance on Moran is misplaced. In Moran, we found an undesigned and unexpected event where a "combination of unusual circumstances . . . led to [the member's] injury[.]" 438 N.J. Super. at 354. Moran, a firefighter, was responding to a report of a fire in a vacant residence. Id. at 350. Moran was part of the "engine company," the unit responsible for transporting fire hoses into buildings to extinguish fires, not rescue victims. Id. at 349. A separate unit, the "truck company," was responsible for forcing entry into a burning structure and rescuing any occupants therein. Ibid. Moran's unit arrived at the scene before the truck company and discovered victims trapped inside the burning building. Id. at 350. Because they expected the building to be vacant, Moran's unit did not have the equipment necessary to break into the building. Ibid. As a result, Moran had to use his body to break down the door and rescue the victims, sustaining a disabling injury in the process. Ibid.

The Board denied Moran's application for accidental disability retirement benefits because his injury "occurred while he was conducting one of his expected work-related duties, rescuing fire victims." Id. at 353. The Board also concluded the incident was not an accident because Moran intentionally threw his body against the door. Ibid. We reversed the Board. Ibid. Although Moran did not suffer a "classic 'accident' in the sense that the

16

house did not collapse on Moran, nor did he trip while carrying a fire hose," we found "the combination of unusual circumstances that led to Moran's injury" was an undesigned and unexpected event. Id. at 354. The fact that Moran intentionally broke down the door did not disqualify him from accidental disability retirement benefits because his injury was the result of "an event, or series of events, 'external' to [him]." Ibid. (quoting Richardson, 192 N.J. at 212-13).

The circumstances presented here are clearly distinguishable from Moran, where the member "encountered an unexpected life-and-death emergency for which he was carrying no tools[,]" requiring him to "forc[e] entry with his body," resulting in him suffering a disabling injury. Id. at 350-51. On the contrary, as a police officer, Toops' training and responsibilities undoubtedly encompassed engaging in foot pursuits for suspects. We therefore affirm substantially for the reasons articulated in the Board's December 6, 2016 decision.

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-1611-16T1