**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3146-22

ORLANDO RADA,

     Petitioner-Appellant,

v.

BOARD OF TRUSTEES,
POLICE AND FIREMEN'S
RETIREMENT SYSTEM,

     Respondent-Respondent.

_____

Submitted September 26, 2024 – Decided October 21, 2024

Before Judges Mawla and Natali.

On appeal from the Board of Trustees of the Police and Firemen's Retirement System, Department of the Treasury, PFRS No. xx7004.

Critchley, Kinum & Luria, LLC, attorneys for appellant (Christopher W. Kinum, on the briefs).

Nels J. Lauritzen, Deputy Director of Legal Affairs, attorney for respondent (Juliana C. DeAngelis, Legal Counsel, on the brief).

PER CURIAM

Petitioner Orlando Rada appeals from a May 8, 2023 final agency decision of the Board of Trustees of the Police and Firemen's Retirement System (Board) denying his application for accidental disability retirement benefits pursuant to N.J.S.A. 43:16A-7. In doing so, the Board adopted the initial decision of the Administrative Law Judge (ALJ), who determined petitioner's disability was not "undesigned and unexpected." We affirm.

On April 4, 2018, petitioner, a thirteen-year veteran of the Newark Police Department (NPD), applied for accidental disability retirement benefits, claiming he suffered from Post Traumatic Stress Disorder (PTSD), caused by a workplace incident. According to petitioner, he attempted to arrest two suspects sought for a series of robberies and shootings. The suspects tried to flee in their vehicle and, in doing so, rammed the side of petitioner's patrol vehicle multiple times. As one suspect began to escape on foot, a second opened fire in petitioner's direction. Petitioner maintained these bullets narrowly missed killing him, passing by his ear close enough to hear a "hissing" sound.

The Board denied petitioner's application for accidental disability retirement benefits, determining petitioner's disability was neither a "direct result of the incident[,]" nor was the incident "undesigned and unexpected." The Board further found:

his disability did not result from the direct personal experience of a terrifying or horror-inducing event that involved actual or threatened death or serious injury, or a similarly serious threat to the physical integrity of the member or another person. The Board also determined that the incident did not meet the reasonable person standard, which states that the event cannot be "inconsequential" and must be "objectively capable of causing a reasonable person in similar circumstances to suffer a disabling mental injury."

Instead, the Board granted petitioner ordinary disability retirement benefits. N.J.S.A. 43:16A-6.

Thereafter, petitioner filed an administrative appeal, and the matter was transmitted to the Office of Administrative Law as a contested case. Before the ALJ, petitioner testified regarding the incident and his deteriorating mental state. Petitioner's wife and his longtime NPD partner, Kenneth Gaulette, also testified regarding the significant effect the event had on petitioner's mental condition. In further support, petitioner called Amor Mehta, M.D., an epileptologist, and David Pilchman, Ph.D., a clinical psychologist, who opined petitioner suffered from PTSD. Daniel LoPreto, Ph.D., a psychologist, testified on behalf of respondent and disagreed with Doctors Mehta and Pilchman, diagnosing petitioner with a "mood disorder with psychiatric features" and claiming no "objective evidence" existed proving petitioners' condition was "significantly or substantially caused" by the shooting.

3

The facts are accurately set forth, in pertinent part, in the ALJ's initial decision as follows:

> Rada had been an officer with the NPD since 2001 and had been in the gang unit partnered with Gaulette for several years. The gang unit had two components, proactive enforcement and investigations into narcotics, gangs and guns. On January 1, 2014, while on patrol, Rada and Gaulette assisted when a detective from their unit had stopped a wanted vehicle. When they approached, the vehicle attempted to flee, crashed into police vehicles, including that of Rada and Gaulette, several times. A passenger then exited that vehicle and Rada exited his vehicle in an attempt to apprehend the suspect. When he exited his vehicle, Rada saw a muzzle flashing from inside the apprehended vehicle and heard several gun shots. As he was running, he heard a loud hissing sound close to his ear, which were bullets whizzing past his ear, and took the suspect down. The apprehended suspect said "good looking out" to Rada, street slang for thank you, which had never been said to Rada before.
>
> Following the end of his shift, instead of going right home, he went to a bar alone for a drink and took another home in an open container. He had never taken a drink in an open container before. When he got home, he smelled like liquor and when he went to bed, was tossing and turning and not sleeping as usual. [His wife] asked him what was wrong, and he said he did not want to talk about it. Subsequently, the incident caused Rada to have continuing problems sleeping, and he called out the NPD code for shots fired in his sleep. He had recurring thoughts of the incident, went to bars to drink after work to forget about it and came home smelling of alcohol.

4

After the January 2014 incident, Rada's behavior changed. He got depressed, did not work out, kept to himself and was not the same happy-go-lucky person. Rada kept drinking and was confronted about it by [his wife]. He was apprehensive in large crowds, felt that someone was out to get him, barely got any sleep and would show up to work tired. Additionally, he lost weight, his sex drive was down, felt isolated, useless, scared[,] and defeated.

Prior to the January 2014 incident, he loved being a cop and wanted to take over the gang unit, but those feelings changed after the incident, and he requested a transfer. He was transferred to the metro unit, which covered events with large crowds, but he became uncomfortable, nervous[,] and scared whenever he would see large crowds. Rada continues to have problems sleeping, lost his sex drive, lost his appetite, lost his desire to work out and has not done martial arts since the shooting.

In a comprehensive written decision issued on March 24, 2023, the ALJ discussed the requirements for accidental disability benefits as a result of psychological stress without physical impact based on our Supreme Court's decisions in Patterson v. Board of Trustees, State Police Retirement System, 194 N.J. 29 (2008), Richardson v. Board of Trustees, Police & Firemen's Retirement System, 192 N.J. 189 (2007), and Russo v. Board of Trustees, Police & Firemen's Retirement System, 206 N.J. 14 (2011). Based on the trial testimony, the ALJ rejected Dr. LoPreto's diagnosis and instead found petitioner suffered from PTSD as a direct result of the shooting. The ALJ found petitioner did not

suffer from any pre-existing condition, including depression or other psychiatric issues, and he established the shooting satisfied the objective reasonableness test set out in Patterson. In this regard, the ALJ determined petitioner established the January 1, 2014, incident was a "terrifying or horror-inducing event that involves actual or threatened death or serious injury . . . ." Russo, 206 N.J. at 33 (quoting Patterson, 194 N.J. at 50).

The ALJ further concluded, however, petitioner did not meet the criteria for accidental disability retirement benefits because the January 1, 2014 shooting was not undesigned and unexpected and thus denied petitioner's request. The ALJ considered the circumstances of the incident and explained petitioner's job responsibilities, which included proactive enforcement and the investigation of narcotics, gangs, and guns, evidenced he would expect to confront violence, armed suspects, and efforts to resist arrest. The Board issued a final administrative decision adopting the ALJ's recommendation. This appeal followed.

As the parties acknowledge, the only issue before us is whether the January 1, 2014, incident was undesigned and unexpected as required by Richardson. Relying primarily on Richardson, Mount v. Board of Trustees, Police & Firemen's Retirement System, 233 N.J. 402 (2018), and an unpublished

6

decision,[1] petitioner argues he is entitled to accidental disability retirement benefits because the incident was undesigned and unexpected, therefore satisfying the requirements of a "traumatic event" under N.J.S.A. 43:16A-7. Specifically, petitioner contends "the unexpected happening was the gunfire that erupted when [he] exited his police cruiser to chase and ultimately apprehend a fleeing suspect." Petitioner further argues the ALJ and Board of Trustees erroneously focused solely on petitioner's job responsibilities and training in concluding the shooting was not undesigned and unexpected. We reject all these arguments.

Our review of an administrative agency's determination is limited. Russo, 206 N.J. at 27. We will sustain an agency's final decision "unless there is a clear showing that it is arbitrary, capricious, or unreasonable, or that it lacks fair support in the record." Mount, 233 N.J. at 418 (quoting ibid.). In determining whether an agency's decision is arbitrary, capricious, or unreasonable, we examine: (1) whether the agency's decision conforms with relevant law; (2) whether the decision is supported by substantial credible evidence in the record;

---

[1] Unpublished opinions do not "constitute precedent" and are "not binding upon any court." R. 1:36-3; see also Guido v. Duane Morris LLP, 202 N.J. 79, 91 n.4 (2010) ("reject[ing] the use of unpublished decisions as precedent").

and (3) whether in applying the law to the facts, "the agency clearly erred in reaching [its] conclusion . . . ." In re Stallworth, 208 N.J. 182, 194 (2011) (quoting In re Carter, 191 N.J. 474, 482-83 (2007)).

We are not bound by an agency's statutory interpretation or other legal determinations and review these issues de novo. Mount, 233 N.J. at 418-19. However, we generally accord "substantial deference to an agency's interpretation of a statute that the agency is charged with enforcing." Richardson, 192 N.J. at 196 (citing R & R Mktg., L.L.C. v. Brown-Forman Corp., 158 N.J. 170, 175 (1999)). "Such deference has been specifically extended to state agencies that administer pension statutes," because "a state agency brings experience and specialized knowledge to its task of administering and regulating a legislative enactment within its field of expertise." Piatt v. Bd. of Trs., Police & Firemen's Ret. Sys., 443 N.J. Super. 80, 99 (App. Div. 2015) (first citing ibid.; and then quoting In re Election L. Enf't Comm'n Advisory Op. No. 01-2008, 201 N.J. 254, 262 (2010)).

Our public pension systems are "bound up in the public interest and provide public employees significant rights which are deserving of conscientious protection." Zigmont v. Bd. of Trs., Tchrs' Pension & Annuity Fund, 91 N.J. 580, 583 (1983). Because pension statutes are remedial in

character, they are liberally construed and administered in favor of the persons intended to be benefited thereby. Klumb v. Bd. of Educ. of Manalapan-Englishtown Reg'l High Sch. Dist., Monmouth Cnty., 199 N.J. 14, 34 (2009).

The Police and Firemen's Retirement System provides for both ordinary, N.J.S.A. 43:16A-6, and accidental, N.J.S.A. 43:16A-7(1), disability benefits. "[A]n accidental disability retirement entitles a member to receive a higher level of benefits than those provided under an ordinary disability retirement." Patterson, 194 N.J. at 43 (citing Richardson, 192 N.J. at 194). In Richardson, the Court held that an accidental disability benefit claimant must prove:

1.    that he is permanently and totally disabled;

2.    as a direct result of a traumatic event that is

    a.    identifiable as to time and place,

    b.    undesigned and unexpected, and

    c.    caused by a circumstance external to the member (not the result of pre-existing disease that is aggravated or accelerated by the work);

3.    that the traumatic event occurred during and as a result of the member's regular or assigned duties;

4.    that the disability was not the result of the member's willful negligence; and

9

5.    that the member is mentally or physically incapacitated from performing [their] usual or any other duty.

[192 N.J. at 212-13.]

The Court defined a "traumatic event" as "essentially the same as what we historically understood an accident to be[,] an unexpected external happening that directly causes injury and is not the result of pre-existing disease alone or in combination with work effort."  Id. at 212.

A petitioner who has suffered a "permanent mental disability as a result of a mental stressor, without any physical impact," must meet an additional requirement to qualify for an accidental disability retirement.  Patterson, 194 N.J. at 33.  In Patterson, the Court held:

> The disability must result from direct personal experience of a terrifying or horror-inducing event that involves actual or threatened death or serious injury, or a similarly serious threat to the physical integrity of the member or another person.  By that addition, we achieve the important assurance that the traumatic event posited as the basis for an accidental disability pension is not inconsequential but is objectively capable of causing a reasonable person in similar circumstances to suffer a disabling mental injury.
>
> [Id. at 34.]

In Russo, the Court clarified that the objective reasonableness standard is met after a petitioner has experienced a "terrifying or horror-inducing

10

event . . . ."  206 N.J. at 33 (internal quotation marks omitted).  Nonetheless, we have held "the diagnostic criteria for PTSD are not identical to the Patterson requirement."  Thompson v. Bd. of Trs., Tchrs.' Pension & Annuity Fund, 449 N.J. Super. 478, 495 (App. Div. 2017).  We also noted the "Supreme Court in Patterson and Russo did not hold that any employee who obtains a PTSD diagnosis qualifies for accidental disability benefits."  Ibid. (citations reformatted).

The Court recently summarized its two-part analysis in cases of permanent mental incapacity resulting from "an exclusively psychological trauma . . . ." Mount, 233 N.J. at 426.  Specifically,

> The court first determines whether the member directly experienced a "terrifying or horror-inducing event that involves actual or threatened death or serious injury, or a similarly serious threat to the physical integrity of the member or another person."  . . . If the event meets the Patterson test, the court then applies the Richardson factors to the member's application.
>
> [Ibid. (first quoting Patterson, 194 N.J. at 50, then citing Richardson, 206 N.J. at 32-33).]

The Mount Court also clarified its observation in Russo that "an employee who experiences a horrific event which falls within his job description and for which he has been trained will be unlikely to pass the 'undesigned and

11

unexpected' test."  Id. at 427 (quoting Russo, 206 N.J. at 33).  The Court stated that the comment in Russo:

> should not be construed to mean that the inquiry regarding whether an event is "undesigned and unexpected" is resolved merely by reviewing the member's job description and the scope of [their] training.  In a given case, those considerations may weigh strongly for or against an award of accidental disability benefits.  To properly apply the Richardson standard, however, the Board and a reviewing court must carefully consider not only the member's job responsibilities and training, but all aspects of the event itself.  No single factor governs the analysis.
>
> [Ibid.]

On this point, we have held an employee may suffer an undesigned and unexpected event in the course of their ordinary duties.  Moran v. Bd. of Trs., Police & Firemen's Ret. Sys., 438 N.J. Super. 346, 354 (App. Div. 2014).  Therefore, a petitioner's job description and training are not dispositive of whether a traumatic event was "undesigned and unexpected."  Mount, 233 N.J. at 427.

In Mount, the officer responded to the scene of a serious motor vehicle accident.  Id. at 409.  When he arrived, he observed an extensively damaged vehicle and the arm of passenger hanging outside of the window.  Ibid.  The vehicle burst into flames.  Ibid.  Lacking firefighting equipment, he returned to

his patrol car while firefighters extinguished the blaze. Id. at 410. He then returned to the vehicle where he witnessed three dead bodies whose skin was "melted . . . ." Ibid. He also stated he could smell and taste the burning flesh. Ibid.

The Mount Court held the officer experienced an "undesigned and unexpected" event by witnessing "a catastrophic accident at close range." Id. at 427. The Court also noted because of his job description, training, and prior experience, Mount could anticipate responding to a serious or fatal accident. Ibid. Moreover, at times, Mount would be expected to remove victims from a damaged vehicle. Ibid. The Court explained, however, that Mount was not "trained to combat, unassisted, an explosion of such magnitude experienced at such a close range." Ibid. The Court noted that Mount did not have any firefighting equipment or protective gear and concluded the circumstances were "extraordinary" as "he was helpless in the face of a terrible tragedy." Id. at 427-28.

Here, we are convinced the January 1, 2014, incident was not "undesigned and unexpected" as required by Richardson. 192 N.J. at 212. Petitioner served for thirteen years on the NPD, two of which as a member of the gang unit. During that tenure, he received extensive training. As the administrative record

13

established, both petitioner and his partner, commendably volunteered for dangerous assignments. The record also established subduing fleeing suspects, confronting violent criminals, investigating perceived criminal activity, and making arrests, including those involving stolen vehicles by fleeing suspects, were clearly within his duties. It was, therefore, not unreasonable to expect that certain of those investigations and arrests would involve the discharge of weapons by suspects, particularly those in flight like the suspects here. Indeed, on the morning of the incident in question, petitioner received explicit instructions from superiors during "roll call" alerting him to the violent tendencies of the suspect vehicle. He did not lack sufficient training, as evidenced by his prompt and successful response to the fast-developing facts, nor was he without proper equipment or support.

Finally, our Supreme Court's decision in Mount does not compel a contrary result as the Board did not base its decision solely upon petitioner's job description. Rather, it considered all aspects of the event, as required by Mount. Simply put, the circumstances of petitioner's encounter with the armed suspect on January 1, 2014, were not "extraordinary" like those described in Mount and not "undesigned and unexpected."

Having reviewed the record, we find no basis to find the Board's adoption of the ALJ's findings was arbitrary or capricious. The ALJ's findings were fully supported by substantial credible evidence in the record and in accord with the controlling statutes and applicable case law.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3146-22